# EXHIBIT "1"

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
------------------------:
                        :    CIVIL ACTION
IN RE:  1H 1, INC., et al. :   NO. 09-10982 (PJW)
                        :
            Debtors.    :
                        :
------------------------:
                        :
GEORGE L. MILLER,       :
Chapter 7 Trustee,      :
                        :
            Plaintiff,  :
                        :    ADVERSARY PROCEEDING
        vs.             :    NO. 12-50713(PJW)
                        :
KIRKLAND & ELLIS, LLP,  :
                        :
            Defendant.  :
                        :
------------------------:
```

- C O N F I D E N T I A L -

ATTORNEYS' EYES ONLY

The videotaped 30(b)(6) deposition of

KIRKLAND & ELLIS, LLP, through JACK S. LEVIN, taken

pursuant to the Federal Rules of Civil Procedure of

the United States District Courts pertaining to the

taking of depositions before Pauline M. Vargo, an

Illinois Certified Shorthand Reporter, C.S.R.

No. 84-1573, at Suite 600, 300 North LaSalle

Street, Chicago, Illinois, on May 22, 2014, at

9:01 a.m.

Page 22

1    formation of the 2005 PEF you shared the formation

2    documents with this same group of partners?

3         A.    It is the same answer.  You see, over

4    the years I've probably overseen the formation of

5    15 or so, maybe more, PEFs; and it's hard for me to

6    remember exactly who as personnel changed I may

7    have met with, shown to, communicated with.

8              I will add another person, a partner,

9    Kurt von Moltke.  V-o-n M-o-l-t-k-e is my best

10   guess as to spelling.  He was an expert on certain

11   rules dealing with broker-dealer regulatory issues,

12   and there were times when our PEFs and DIFs in

13   making investments would be asked to answer --

14   asked by funds in which we were investing to answer

15   these kind of broker-dealer regulatory issues, and

16   so I have in the PEF documents various paragraphs

17   that people would supply us with information

18   initially and supply us with information about

19   changes; and so I would have had Kurt von Moltke

20   review to make sure that these ever-changing rules

21   promulgated by the broker-dealer regulatory people

22   were reflected in our latest iteration in that

23   document.

24        Q.    You mentioned the PEF investment

A3

Page 23

1    committee.   Is that also known as the manager

2    committee?

3         A.    Yes.

4         Q.    And for the 2003 PEF, was Mr. Hammes a

5    member of the manager committee?

6         A.    Over the years the members of the

7    manager committee have changed, and to the best of

8    my recollection, at the time of the '03, Jeffrey

9    Hammes was a member of that committee.

10             I have been a member of that committee

11   from the beginning of the formation of these funds

12   back in 1992 when we began this program, and other

13   members of the committee have changed as their

14   responsibilities for other things change, as they

15   leave the firm or join the firm.

16             And so I think we may have supplied you

17   with written lists of the names, but I take it you

18   are asking me to -- what do I think it was in 2000

19   and -- I think you are talking about 2003 now, and

20   I think Jeff Hammes was at that time a member of

21   that committee.

22        Q.    Does he remain a member of the manager

23   committee for the 2003?

24        A.    No, he does not.

1    transactions, so my recollection of precisely when

2    each person served or whether there is another name

3    or two who have served on the committee -- oh, I'm

4    sorry.  I think of a couple more.  Fred Tanne,

5    T-a-n-n-e; and I'm sure there are a couple of

6    others who have served.

7         Q.    Has Mr. Gessner ever served on the

8    management committee of the PEF?

9         A.    Ask me the question again.

10        Q.    Has Mr. Gessner ever served on the

11   manager committee for any of the --

12        A.    Doug Gessner?

13        Q.    Yes.

14        A.    He has never served on the management

15   committee, no.

16        Q.    Is the manager committee for the 2003

17   PEF the same as the manager committee for the 2005

18   PEF?

19        A.    Do you mean are the same people on the

20   committee?

21        Q.    Correct.

22        A.    I don't recall whether they are

23   precisely the same or not.

24        Q.    For the 2003 PEF, did the manager

Page 26

1   committee make investment decisions for that

2   entity?

3        A.     Ask the question again.

4        Q.     For the 2003 PEF --

5        A.     '03 PEF.

6        Q.     -- did the manager committee make the

7   investment decisions for that entity?

8        A.     Yes.

9        Q.     And you are aware that the 2003 PEF

10  invested in Sun Capital Partners III QP, LP,

11  correct?

12       A.     Yes.

13       Q.     Were you involved in the decision to

14  make that investment?

15       A.     I was, yes.

16       Q.     What did you do to analyze whether that

17  investment should be made?

18       A.     As is typical when a private equity fund

19  is being formed, the principals at the fund prepare

20  what we call a POM, a private offering memorandum.

21             It is a document that may be 50 or 100

22  pages long.  It tells you a great deal of

23  information about the people who are forming the

24  fund, their background, their prior experience,

1    their record of making investments in the past; the

2    kind of investments they are aiming at making in

3    the future; the terms of the fund; how large the

4    fund will be; how long the fund will last.

5              In addition, that document, the POM,

6    needs to be looked at in conjunction with a second

7    document called the fund agreement.  The fund

8    agreement is a legal document.  A partnership

9    agreement is technically what it is, describing the

10   rights and obligations of the general partners,

11   that is, the people who are forming the fund, and

12   the limited partners, that is, the investors who

13   are investing money in that fund.

14             So the first step in the formation of a

15   fund -- let me rephrase that.

16             The first step in the manager

17   committee's decision whether to invest in a

18   particular fund would be to review the private

19   offering memorandum and the partnership agreement

20   and other allied papers.

21             The second thing that I would typically

22   do is to talk with the Kirkland partners who do

23   work for that client to find out whether they think

24   this would make a good investment, to get any

Page 28

1    further information that they might have.  Then I

2    would talk it over with the other members of the

3    manager committee, and I would make a decision then

4    whether to invest in the fund along with and in

5    consultation with the other members of the manager

6    committee.

7          But I think it is fair to say that I

8    have generally been the lead manager on behalf of

9    the manager committee.  I am the person that's

10   longest serving and have the most knowledge of the

11   continuity of these events.  And while all three of

12   us now on the committee -- and at one time I think

13   there were four and at one time five -- all of us

14   on the committee interact with the investment

15   partnership department's people, I probably have

16   more contacts with them and probably end up making

17   a dozen or more decisions a week with respect to

18   these investments.

19    Q.   Your prior answer described what the

20   manager or your role as a member of the manager

21   committee does when you are deciding to invest.  Do

22   you believe you followed those three steps with

23   respect to the investment in Sun Capital Partners

24   III QP, LP?

1      A.      I believe I followed all the steps that

2   I was outlining.

3      Q.      And subsequently when the 2005 PEF

4   invested in Sun Capital Partners IV LP, do you

5   believe you also followed the three steps you

6   outlined?

7      A.      Yes, that's correct.

8      Q.      From whom did you receive the private

9   offering memo for Sun Capital Partners III QP, LP?

10     A.      From whom did I receive it.  I have no

11  clear recollection of that.  What I can tell you is

12  that I typically receive a private offering

13  memorandum and other documents from either the fund

14  itself that's being formed who would e-mail it to

15  us or Fed Express it to us before e-mail was so

16  prevalent.

17          Sometimes, in addition, when I had

18  received information that a fund was being formed

19  and I hadn't yet received directly from the fund

20  that kind of paperwork, I might ask a member of the

21  investment partnership department staff such as

22  Loberg, Rubel or Murray to contact the fund and see

23  if they would like to send us a copy.

24          So, sometimes I would receive it

1          And so, as we advised them in the

2    private offering memorandum, you could expect your

3    commitment to be called down over a period of

4    approximately five years, perhaps a little longer.

5          And if you invested in that stable fund

6    and you were a 1 percent owner of that stable fund,

7    you would have 1 percent of the fund's investment

8    in each underlying private equity fund.  So, that's

9    what I would call the PEF program.

10          Now, in addition to that, somewhere

11    along this 22-year or so period we developed a

12    second concept.  That was called the co-invest

13    program.

14          If the manager committee decided that a

15    given fund should have a co-invest element, we

16    would send a notice out to all of the Kirkland

17    partners who were QPs.  "QPs" means qualified

18    purchasers.  Qualified purchasers is defined by the

19    Investment Company Act of 1940 as being someone who

20    met certain financial conditions.  Let's call it

21    fairly high financial conditions, higher than were

22    necessary to invest in the PEF program.

23          And we would send a notice out and say

24    fund "X" is now -- private equity fund "X" is now

1    being formed by clients; our PEF is going to invest

2    a certain number of dollars in the fund.  If you

3    would like to invest additional dollars in that

4    fund, that one fund, not in the whole portfolio of

5    funds to be acquired by that PEF but in that one

6    fund, sign here, send it back.

7              And then we would make an investment in

8    a fund of a certain number of dollars from the PEF

9    and a certain number of dollars from the

10   co-investors.  So, they were electing to make an

11   investment in that one fund.

12             Now, some funds we would have that kind

13   of add-on co-invest programs, some underlying funds

14   we would not; and there were many factors that went

15   into that decision.

16             That I think answers your question as to

17   why in the Sun '05 fund there was a dual

18   investment, our PEF and some co-investors; and the

19   co-investors, as I recall it, in that fund included

20   about a half dozen people of whom I was one and no

21   one who was on the Sun biller list, no one who

22   regularly did work for Sun, no one who was on the

23   list that you have been focusing on.  For example,

24   Doug Gessner was not a member of that group.

1    committee, all these different names are

2    interesting, but they are just mechanical.  They

3    are through what bank account does the money flow.

4                But from a substantive standpoint, the

5    entire investment management program, the entire

6    PEF and co-invest program is really in my mind a

7    single program of making investments in good

8    private equity funds from a series of PEFs and a

9    series of co-investor groups, and it's for

10   bookkeeping purposes that we have to have all these

11   different names.

12               But substantively, for me to manage and

13   make a decision whether to put the money in, I

14   don't spend a lot of time asking through which bank

15   account shall we transfer this money, and we manage

16   it as a single program.

17       Q.    Do you know why K&E Partners II had a

18   name change to Randolph Partners II?

19       A.    Yes.

20       Q.    Why?

21       A.    Well, originally we had many different

22   names.  Just to go back to ancient history,

23   probably the first name for the first program we

24   had was called KLANS, and it stood for Kirkpatrick,

1    Levin, Adess, Nygren, and it was the first entity

2    that we ever formed back in the 1980s, and that

3    entity made a few investments, and then we said,

4    well, let's make this a more formalized thing when

5    we decided we would offer it to a greater number of

6    Kirkland partners.  That was like five or so

7    Kirkland partners, and we just made some

8    investments on our own in the KLAN's entity.

9         And then I said, hey, this is a really

10   good idea.  Let's expand this to more Kirkland

11   people.  So, then we started forming some vehicles

12   that were called K&E Partners because we were all

13   K&E partners.  There was no K&E money in any of

14   these investments, not in the old KLAN's

15   investments, not in the K&E Partners Investments,

16   not in the Randolph Street Partners investments,

17   not in the Roman II investments, never any K&E

18   money.  It was at the beginning just five of us

19   getting together and kind of sharing investment

20   ideas like a little investment club, and we made a

21   few investments.

22        So, we moved from using the KLAN's

23   vehicle, which was, you know, KLAN's Fund I and

24   KLAN's Fund II and KLAN's Fund III to forming

Page 65

1    co-investment program and come to them and say we

2    would like 10X worth, and they would say, no, I'm

3    sorry, we are oversubscribed, we will give you 8X

4    worth, and so that's called getting cut back, and

5    so we would in some instances be cut back.

6              And if what you are asking me is in Sun

7    IV did we want more and get cut back, I have no

8    recollection.

9         Q.    In the situation you were just

10   testifying about with the co-invest and then the PE

11   fund coming together, am I correct the manager

12   committee decides how much the PE fund wants to

13   invest?

14        A.    Yes, that's correct.

15        Q.    So you and the other managers for the

16   2005 PEF would have made a determination of how

17   much of the total capital raised or potential

18   contributions raised by the members would go to Sun

19   Capital IV, correct?

20        A.    How much of the 2005 PEF's money would

21   go into this Sun Capital fund, would be committed

22   to the Sun Capital fund.  Couldn't guaranty that

23   they were going to call all of it down over their

24   5- or 10-year life, but we would decide, the

1    manager committee would decide how much we wanted

2    to commit to that fund, yes.

3        Q.    What goes in -- at least with respect to

4    the 2005 fund, what went into determining how much

5    to commit to the Sun Capital IV fund?

6        A.    All the factors that I told you about:

7    The reputation of the people, their past record,

8    the information we learned from the offering

9    circular.

10           And many of us on the committee knew the

11   two gentlemen who were the leaders of this fund,

12   and they were very well-known people.  I mean, it's

13   not like we are the only ones in the world that

14   knew them.  We had been together at conferences

15   many times.  We've talked to them, and we thought

16   very highly of the two principals who had formed

17   the Sun fund.  They were leaders in the industry,

18   and the opportunity to invest in a fund that they

19   were going to oversee was something that we

20   welcomed.

21       Q.    Is it fair to say that the same factors

22   went into the manager committee's decision with

23   respect to the 2003 fund --

24       A.    Yes.

1     Q.    -- on how much to commit?

2     A.    Absolutely.

3     Q.    You said that there currently are

4 Randolph Street Partners as one entity and Randolph

5 Street Ventures as another entity, each having sub

6 funds, correct?

7     A.    That's right.

8     Q.    Is there a particular type of investment

9 that Randolph Street Partners makes as distinct

10 from Randolph Street Ventures?

11     A.    Randolph Street Partners is generally

12 the entity that makes the PEF investments.

13     Now, to every answer there are slight

14 differences by time period or by a particular set

15 of circumstances only because what we are doing is

16 we are trying to comply with all laws and rules and

17 regulations, and there are sometimes slightly

18 strange reasons that you might do one or two funds

19 differently.  But in general, as I've just said,

20 Randolph Street Partners is the entity through

21 which we tend to make all of the PEF investments.

22     Q.    What types of investments generally are

23 made through Randolph Street Ventures?

24     A.    Randolph Street Ventures, I believe

1    more than ten, and probably only three or four ever

2    took advantage of it.  But we felt that giving them

3    the opportunity was the right thing to do so that

4    they didn't -- our top executives didn't feel they

5    were excluded just because they weren't lawyers.

6         Q.    As a member of the manager committee for

7    the 2003 PEF, after making the decision to invest

8    in Sun Capital Partners III QP, LP, were you called

9    upon to make any determinations of companies that

10   fund, the Sun Capital fund, should invest in?

11        A.    Never.  We as a limited partner have no

12   ability to influence any decision-making that goes

13   on within a private equity fund in which we have

14   invested.  The fund is run solely by the private

15   equity group, the general partner, the Sun folks,

16   and we do not have any opportunity for input.

17             Now, that's what the legal documents

18   say.  That's the way the practice is, but I would

19   add to that that any fund we went into had a large

20   number of limited partners.  I doubt that there has

21   ever been a fund that we invested in where we did

22   more than 1 percent of the investment, where we

23   were a larger than 1 percent LP.

24             And indeed, I've over the years run

1    statistics occasionally, and they indicate that the

2    average fund that we invest in, we are smaller than

3    one third of 1 percent of the money, so that if we

4    had wanted to have input, we would probably have

5    been the last person that the fund managers would

6    have asked about how should we make this decision,

7    because, as I say, we were one third of 1 percent

8    in the average fund and I don't believe ever more

9    than 1 percent of the money even in a small fund;

10   and therefore, they made the decisions at the

11   general partner level of the fund.

12            And, of course, that's what we wanted.

13   We invested in the fund because we had confidence

14   in the fund's general partners, the people who were

15   running and forming -- forming and running the

16   fund; and our experience doesn't go to selecting

17   the companies in which we think the fund should

18   invest.

19            So, no, we had no right to influence

20   that.  We never tried to influence that.  No one

21   would have wanted that, not the fund and not us.

22       Q.    In 2003 Kirkland was doing legal work

23   for Sun Capital Partners, is that correct?

24       A.    In 2003?

1    treated as an LP.

2              Our lawyers who were working on the

3    transaction, if we were retained to work on that

4    transaction, they would, of course, be doing that.

5    But we maintained confidentiality within Kirkland

6    on all sorts of things, and in general a lawyer

7    working on a transaction, especially where that

8    transaction involves publicly held companies where

9    the stock is traded, they do not talk about the

10   transaction until it's publicly announced outside

11   the working group.

12             And we have rules about that, and we

13   have blocks on our computer system where a person

14   not working on a given transaction can't tap in and

15   get information about -- off the computers about

16   deals where they are not authorized to work on the

17   deal, internal firewalls.

18        Q.    In response to a question probably three

19   minutes ago --

20        A.    I have to add one more thing.

21        Q.    You may.

22        A.    Everybody in the investment committee is

23   a busy person.  We wouldn't be on that committee if

24   we weren't busy persons engaged in many interesting

1    activities, but we would have no interest in

2    finding out about a pending transaction.  We have

3    made our investment, it's a 10-year or so

4    investment, and we will hear about it when they

5    send us a letter just like any other LP.

6           But since we have no ability to

7    influence, nor would we want to influence the fund,

8    it's not important to us to hear that they are

9    looking at 27 different possible acquisitions of

10   which they might only close one or two.

11          So, we don't seek to learn about what

12   the fund is doing.  We only make our investigation

13   when the fund is being formed and we are trying to

14   decide whether we want to make an investment.

15          In more understandable parlance, we have

16   a decision to make about whether we want to invest

17   and then we have no supervisory responsibility.  We

18   are busy doing other things until some other

19   decision comes our way.

20   Q.    In response to that question and an

21   earlier question you talked about the investment

22   committee.  When you used that phrase, are you

23   using it as a synonym for manager committee?

24   A.    Yes, I am.

1  they knew that we were making an investment.

2        Now, at the time we did that it seemed

3  like surplusage, but that's what we did, because

4  they certainly knew we were making an investment.

5  They had invited us to make an investment.

6        We only invested in funds that had

7  invited us to invest, and then we submitted to them

8  paperwork saying, yes, we will invest.  Typically

9  there will be some kind of thank-you note or

10  thank-you phone call saying "we appreciate your

11  investment," and we would make the investment.

12        And so they knew, but I can remember

13  sometime early in that decade that we sent out a

14  memo saying be sure that you document the making of

15  the investment with a letter pursuant to 1.8, and

16  we prepared a couple of alternative forms that

17  could be used for those letters to just serve as

18  evidentiary evidence with respect to the fact that,

19  yes, the private equity fund that we are making the

20  investment in does indeed know we are making the

21  investment.

22        That was the point of that, and there

23  was at least one memo that I can think of, and

24  whether it was called a memo or an e-mail or just a

1    is either where they are saying, look, we will

2    invite you to invest in this fund, it is doing

3    early stage, you know, west of the Mississippi and

4    that's the only fund we are inviting you to invest

5    in.  Well, then we don't want to embarrass them.

6    Or if we think we might only want to do this one

7    fund, it's a particularly good-looking fund, then

8    we will use it.

9             So, those are some of the considerations

10   that go into choosing the two letters, but our view

11   was that two letters would have the same

12   ramifications:  Informing them that they know,

13   having them confirm that they know that if we make

14   an investment in their fund, we've made an

15   investment in their fund.

16       Q.    Do you recall any time between 2003 and

17   the present turning down an invitation from Sun

18   Capital to have an investment entity made up of

19   lawyers from Kirkland & Ellis invest?

20       A.    I do not recall any such instance.

21       Q.    Do you know how many invitations over

22   the course of that time period you received as a

23   member of the manager committee for the various

24   PEFs?

1      MR. REICH:  For Sun?

2      MS. McILVAIN:  From Sun, yes.  I'm sorry.

3  BY THE WITNESS:

4      A.     I can remember Sun III and Sun IV, which

5  are the two we are talking about here.  I have a

6  vague recollection that before that there was a Sun

7  I and Sun II.  At some point there was a slightly

8  different kind of fund that had a different name.

9  It was called Sun Securities I and there was a Sun

10  Securities II, and I believe there is a Fund V, Sun

11  Fund V.  I can't remember -- I can't remember if

12  there is a Sun VI.

13          But I believe that we have accepted

14  every invitation that Sun has given us to invest

15  because of our belief that they are one of the most

16  desirable fund groups, I would say, in the United

17  States, but it's now a worldwide industry, in the

18  world, one of the most desirable groups in the

19  world.

20          So, no, I do not believe we have ever

21  turned down an invitation.  Now, we might have

22  modulated how much we want to invest.  We might

23  have invested more in some times and less in

24  others, and we would make that decision each time

1   with the manager committee as to how much to

2   invest.

3       Q.    You said often these various funds are

4   directed at a particular industry or a particular

5   age of a company or companies.  Was there a

6   particular industry Sun Capital funds invested in?

7       A.    I don't recall any particular industry

8   orientation.

9            I do think that the Sun Securities I and

10  the Sun Securities II funds that they formed which

11  are not involved at all in this lawsuit were aimed

12  at something unusual, like traded securities that

13  they were going to buy up with the idea of

14  ultimately taking the company private.

15           Now, I may be wrong in that, but that's

16  my recollection.  It's a lot of years.  So, Sun

17  Securities I and Sun Securities II had a different

18  orientation, and orientation could be different

19  industry, different geography, different age,

20  different size of the company, or in that case a

21  different location of the company on the investment

22  spectrum.

23           And I think Sun Securities I and II were

24  companies that were -- they were going to go into

1           (Plaintiff Deposition Exhibits 22

2              and 23 were marked for

3              identification, as of 05/22/2014.)

4    BY MS. McILVAIN:

5       Q.    Sir, first I'm going to ask you a

6    question about P22.  Was P22 one of the documents

7    you were testifying about earlier?

8       A.    That is the document to which I alluded

9    that I thought I recalled something around the

10   early 2000s that was sent out to the people who

11   were bringing in opportunities to invest in private

12   equity funds and telling them about the desire to

13   get a 1.8 letter confirming that the clients knew

14   what was obvious to the clients.

15      Q.    The memo that is in front of you -- is

16   it an e-mail or a memo?

17      A.    Don't know.

18      Q.    The document then that's in front of

19   you --

20      A.    Yes.

21      Q.    -- and marked as P22 refers to two forms

22   of investment letter described more fully in the

23   attached instructions.

24              Do you know where the instructions are

1          As I described before, once we made a

2    commitment to a fund, we were contractually bound

3    whenever they called the money to send them the

4    money; and the only obligation they then had to us

5    is when they sold something or otherwise realized

6    that investment to send us the money, and that none

7    of us involved in the Kirkland investment fund had

8    any ability to influence the activities of Sun or

9    any other private equity fund in which we had

10   invested, either to ask them to sell things or buy

11   things, not buy things or refinance things.  We

12   were not involved in that.

13          So, my duty as a fiduciary of these

14   funds was to pick good funds to invest in, make

15   rational investments in those funds and then to

16   watch to see if they ever violated any documents

17   but not to oversee what they bought and what they

18   sold.

19          So, I would generally get an indication

20   from the investment partnership department, Murray

21   Rubel and --

22        Q.    Loberg?

23        A.    -- Loberg as to whether they saw some

24   disaster happening, and at that point I would look

# EXHIBIT "2"

To:     All Transactional Billers

From:   Jack S. Levin

Date:   June 3, 2004

Re:     Mandatory Rule 1.8 Investment Letters Signed by Client for DIF/PEF/Other Client-Related
Investments

Applicable ethical rules require us to make certain disclosures and obtain written client consent when we engage in certain business transactions with our clients.  These rules (based on ABA Model Rules of Professional Conduct 1.7 and 1.8(a)) mandate that we have an executed consent letter on file with respect to each DIF/PEF investment (as well as any other permitted co-investment).

We have instituted a new firm policy to ensure that this occurs.

The DIFs and PEFs will not disburse funds for a new investment unless a Rule 1.8 investment letter in the applicable form (attached) has been, or is being, obtained from each applicable client.

There are two forms of the investment letter, described more fully in the attached "Instructions."

(1)  Fund Investment Program Version to be used for a fund client with which we routinely co-invest. This blanket consent need be executed only once by a private equity firm and is intended to serve as the applicable notice to and consent from that firm (and all of its funds) for all co-investments made by any K&E-related vehicle at that private equity firm's invitation.

(2)  Single Investment Version to be used for all other circumstances, including (a) any fund client from which we have not obtained the Fund Investment Program version of the letter, where a DIF co-invests in

a portfolio company at the invitation of that fund client, (b) any fund client in which a PEF invests as a limited partner in the fund and (c) any company client in which a DIF directly invests (including any portfolio company of a fund client from which we already have obtained a Fund Investment Program version of the letter, if we are directly investing in the portfolio company and the portfolio company is also a client).

The attached Instructions and two form letters are available in all offices through the K&E Policies bulletin board in Lotus Notes.  Nuala Murray can also provide you with a copy at any time.

If you have questions regarding the attached, please direct them to David Erie, who is familiar with the applicable rules, the forms, their derivation and their proper use.

DEP. EX. NO. 22
FOR I.D., AS OF 5-22-14

# EXHIBIT "3"
## TO MEMORANDUM OF LAW IN SUPPORT OF KIRKLAND & ELLIS LLP'S MOTION FOR SUMMARY JUDGMENT

## THIS DOCUMENT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER AND CONFIDENTIALITY AGREEMENT
## [ENTERED ON JUNE 18, 2015; ADV. DOCKET NO. 66]

**EXHIBIT "4"**
**TO MEMORANDUM OF LAW IN SUPPORT OF**
**KIRKLAND & ELLIS LLP'S MOTION FOR**
**SUMMARY JUDGMENT**

**THIS DOCUMENT IS FILED UNDER SEAL**
**PURSUANT TO PROTECTIVE ORDER AND**
**CONFIDENTIALITY AGREEMENT**
**[ENTERED ON JUNE 18, 2015; ADV. DOCKET NO. 66]**

**EXHIBIT "5"**
**TO MEMORANDUM OF LAW IN SUPPORT OF**
**KIRKLAND & ELLIS LLP'S MOTION FOR**
**SUMMARY JUDGMENT**

**THIS DOCUMENT IS FILED UNDER SEAL**
**PURSUANT TO PROTECTIVE ORDER AND**
**CONFIDENTIALITY AGREEMENT**
**[ENTERED ON JUNE 18, 2015; ADV. DOCKET NO. 66]**

**EXHIBIT "6"**
**TO MEMORANDUM OF LAW IN SUPPORT OF**
**KIRKLAND & ELLIS LLP'S MOTION FOR**
**SUMMARY JUDGMENT**

**THIS DOCUMENT IS FILED UNDER SEAL**
**PURSUANT TO PROTECTIVE ORDER AND**
**CONFIDENTIALITY AGREEMENT**
**[ENTERED ON JUNE 18, 2015; ADV. DOCKET NO. 66]**

# EXHIBIT "7"

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| IH 1, Inc., et al., | : | Case No.: 09-10982 (PJW) |
| | : | |
| Debtors, | : | (Jointly Administered) |
| | : | |
| GEORGE L. MILLER, | : | |
| Chapter 7 Trustee, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. Proc. No.: 10-52279 (PJW) |
| | : | |
| SUN CAPITAL PARTNERS, INC., et al. | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

## DECLARATION OF DOUGLAS C. GESSNER, P.C.

I, Douglas C. Gessner, am an attorney admitted to practice in Illinois, and am a partner of the law firm of Kirkland & Ellis LLP ("Kirkland"). I submit this declaration in support of the Sun Capital Defendants' Opposition to Plaintiff's Motion to Disqualify Kirkland & Ellis LLP. I have personal knowledge of the facts stated in this declaration, which are true and correct, and could competently testify as to each if called to do so.

1.     Sun Capital Partners, Inc. and/or certain of its affiliates ("Sun Capital") are collectively one of Kirkland's largest clients. Kirkland began representing Sun Capital in February 2000.

2.      In August 2005, Sun Capital asked Kirkland to represent it and certain of its affiliated private investment funds in Sun Capital's effort, along with other investors, to acquire Indalex from a subsidiary of Honeywell International Inc.  That effort was successful, and the acquisition closed on February 2, 2006.

3.      Prior to February 2, 2006, Kirkland provided services to Sun Capital, not Indalex and it was not until after Sun Capital acquired Indalex that Kirkland began providing services directly to Indalex.

4.      From the closing of the acquisition, Sun Capital affiliates, through their investment in Sun Indalex, LLC owned over 90% of the outstanding common stock of Indalex Holdings Finance, Inc., the holding company that oversaw the operations of all of the Indalex companies.  Sun Capital representatives held a majority of the seats on Indalex Holdings Finance, Inc.'s, and each of its subsidiaries', boards of directors.

5.      Sun Capital affiliates also provided advisory and consulting services to Indalex pursuant to a Management Services Agreement, through which Sun Capital affiliates gained access to Indalex's business records and information.

6.      Attached as Exhibit A is a true and correct copy of the February 2, 2006 Management Services Agreement entered into between Indalex Holding Corp., Indalex Limited, and Sun Capital Partners Management III, LP.

7.      Attached as Exhibit B is a true and correct copy of the retention letter between Kirkland and Indalex, dated February 2, 2006.

8.      Kirkland first began providing legal services to Indalex after the closing, in February 2006.  Kirkland last performed work for Indalex in March 2009.

2

9.    With respect to the plaintiff's motion to disqualify Kirkland, the plaintiff has identified 11 categories of legal services provided by Kirkland for Indalex that the plaintiff alleges relate to the plaintiff's complaint, filed on July 30, 2010. The scope and extent of Kirkland's work with respect to each of the categories of legal services identified by the plaintiff is discussed below.

### The Management Services Agreement

10.    Plaintiff identifies several time entries relating to the Management Services Agreement between Sun Capital Partners Management III, LP and Indalex. The Management Services Agreement, however, was negotiated prior to Sun Capital's acquisition of Indalex and executed at the closing. All work performed by Kirkland with respect to the drafting and execution of that agreement was performed on behalf of Sun Capital.    The only Kirkland attorney performing any work with respect to the Management Services Agreement following its execution was Michael D. Wright, who spent a total of 2.25 hours on work performed at the request of, and for the benefit of, Sun Capital.    That work was billed to Indalex pursuant to Sun Capital and Indalex's contractual arrangement requiring Indalex to reimburse Sun Capital for all outside legal expenses incurred in connection with the parties' relationship.

### Reviewing Indalex's 2006 10-K

11.    Plaintiff identifies Kirkland's review of Indalex Holdings Finance, Inc.'s Form 10-K for the year 2006, in particular, charges billed to Indalex for Kirkland's review of that document between March 14, 2007 and April 2, 2007. The attorneys at Kirkland involved in reviewing and commenting on Indalex's 2006 10-K were James

3

Rowe, Elisabeth Martin, Chad Keetch, David Johanson, and Ted Frankel. Kirkland's sole function in reviewing the 10-K for Indalex was to ensure compliance with the technical aspects of applicable SEC rules and regulations. No Kirkland attorney provided Indalex advice or legal services relating to the underlying financial data disclosed by Indalex. The Kirkland time entries that reflect this work total approximately 33.75 hours. Those time entries, however, include many other unrelated tasks that are not segregated within billing blocks, including work related to drafting, revising, and analyzing credit documents, exchange offer materials, press releases, and a 314(b) opinion.

### Revising An April Earnings Release

12.    Plaintiff asserts that a single time entry of 0.5 hours on March 29, 2007 from James Rowe, who reviewed an earnings release, demonstrates that Kirkland performed legal services related to the allegations in the complaint. However, Mr. Rowe's work during that half hour consisted solely of ensuring compliance with the technical aspects of the SEC rules and regulations applicable to earnings releases. Mr. Rowe did not assist in the drafting of the earnings release itself, and he did not provide any advice or legal services related to the financial information disclosed by Indalex.

### Review of Materials Related to Dividend from Proceeds of AAG Sale

13.    Plaintiff identifies numerous time entries related to a possible dividend from the proceeds of the then-anticipated sale of AAG. In addition to the attorneys discussed in other sections, Ted Frankel, Jeremy Liss, David Johanson, and I performed limited legal work related to Indalex's declaration and payment of a dividend from the proceeds of the AAG sale. With respect to the AAG sale and the resulting dividend,

4

Kirkland did not provide any analysis with respect to Indalex's financial condition. Instead, Kirkland's advice related to Indalex's legal obligations relating to the AAG transaction. For example, Mr. Frankel, who billed 6.5 hours related to this subject, was one of the primary attorneys representing Sun Capital in the 2006 acquisition of Indalex. Accordingly, Mr. Frankel's advice to Indalex was limited to providing institutional knowledge regarding Indalex's obligations under the various acquisition agreements and providing the basic requirements for dividends under Delaware law.    In total, not including the more specific categories discussed below, Kirkland billed a total of 10.0 hours to this work.

### Review of April 2007 10Q

14.    Plaintiff identifies "charges between May 8, 2007 and May 18, 2007 relating to the [second quarter] Form 10-Q" filed by Indalex Holdings Finance, Inc. Elisabeth Martin and Chad Keetch are the two Kirkland attorneys that performed work for Indalex related to this issue.[1]   Kirkland's review of the second quarter 2007 10-Q consisted solely of analyzing the disclosure for compliance with SEC requirements. Neither Mr. Keetch nor Ms. Martin provided any advice or legal services relating to any financial disclosures made by Indalex. Mr. Keetch, who has since left the firm, billed a total of 21.5 hours to this matter. Ms. Martin billed 2.5 hours to this matter.

---

[1]    Other Kirkland lawyers billed time relating to this issue. But this additional advice related solely to the timing of the filing and the review and drafting of a 12b-25 statement allowing for an extension.

5

### Revising a May Earnings Release

15.     Plaintiff identifies two time entries totaling 2.75 hours on May 15, 2007 charged by James Rowe and Carol Anne Huff relating to Kirkland's review and comment on Indalex's May 2007 earnings release. Kirkland's work for Indalex on this release consisted solely of ensuring that the disclosures therein were compliant with the company's obligations under relevant SEC rules and regulations. Neither Mr. Rowe nor Ms. Huff provided any advice or comments on the underlying financial data included in the earnings release.

### Reviewing and Revising Pro Forma Financial Statements

16.     The plaintiff identifies three time entries related to "reviewing, discussing and revising pro forma financial statements in mid-May 2007." The attorneys responsible for those two entries were James Rowe and Carol Anne Huff, both partners in Kirkland's capital markets group. The total time spent with respect to those entries, which also included: (i) review of a related tender offer to the bondholders; and (ii) research and analysis regarding covenant obligations under Indalex's indenture, was 7.5 hours. The sole purpose of Kirkland's review was to ensure compliance with relevant SEC disclosure requirements. Neither Mr. Rowe nor Ms. Huff provided any advice or comments on the underlying financial data included in the pro forma statements.

### Review and Comment on FTI Solvency Opinion

17.     Plaintiff identifies "[c]harges between May 30, 2007 and June 1, 2007 relating to FTI including eight separate entries relating to FTI's solvency 'opinion' including entries for three different Kirkland & Ellis lawyers to review and comment on

6

drafts of FTI's 'opinion' and for Kirkland & Ellis lawyers to discuss the 'opinion' with both FTI and Sun." The Kirkland attorneys responsible for these entries, which total 17.75 hours, were Jeremy S. Liss, Brandon B. Smith, and me. All of the comments provided by Mr. Liss, Mr. Smith, and me with respect to the FTI solvency opinion related to the technical requirements of the Delaware statute and addressed whether the opinions set forth in FTI's opinion adequately addressed those requirements. Neither Mr. Liss, Mr. Smith, nor I provided any analysis or advice with respect to FTI's analysis or conclusions regarding the Debtors' financial condition.

### Drafting, Reviewing and Revising Board Resolutions

18.     Plaintiff identifies time entries for drafting, reviewing and revising Indalex Board Resolutions relating to the May/June 2007 dividend. The Kirkland attorneys who billed time to this matter were Ted Frankel, David Johanson, and me. Kirkland billed only 10.25 hours to this matter. In connection with this review, no Kirkland attorney provided any opinion or advice with respect to the solvency of Indalex or whether the proposed dividend would constitute an avoidable transfer. Kirkland's work revolved solely around whether Indalex's resolutions met the technical requirements required under relevant Delaware law and Indalex's various indenture and credit agreements.

### Work Relating to Sale-Leaseback Transactions

19.     Plaintiff identifies charges relating to the sale-leaseback transactions contemplated and undertaken in May 2008. As an initial matter, the law firm of Klehr Harrison Harvey Branzburg & Ellers LLP handled the actual sale-leaseback transactions. Kirkland's involvement was limited to credit agreement and indenture compliance and

A40

related environmental issues.  From January through May 2008, Kirkland attorneys Sean

O'Brien (who left the firm in June 2008), Carol Anne Huff, Michael Wright, Christian

Semonsen, Natalia Sokolova, Elizabeth Martin, James Rowe, and Roberto Miceli billed a

total of 52.5 hours on leaseback issues.  No Kirkland attorney performed any work or

provided advice with respect to the value of the transferred property or the substantive

terms of the return lease.  Christian Semonsen, a partner in Kirkland's environmental

practice, billed a total of 5.5 hours relating to environmental matters associated with the

sale of real estate.

### Work Relating to 2008 Loans

20.    Plaintiff identifies "[d]ozens of separate entries relating to the equity

infusions made by Sun Capital in 2008."  The actual drafting and documentation of Sun

Capital's 2008 loans, which were incorporated into the existing credit agreement with JP

Morgan, was handled by the law firm of Cravath, Swaine & Moore LLP.  Although a

portion of Kirkland's time in this matter was related to assisting Indalex in the execution

of the loan agreement documented by JP Morgan and Cravath, the vast majority of time

entries related to Kirkland's work on behalf of Sun Capital regarding: (i) intercreditor

issues between JP Morgan and Sun Capital in connection with Sun Capital's infusion of

capital into the existing credit facility; and (ii) the formation of a new Sun Capital-related

entity to act as the lender under the transaction.  The following attorneys billed time to

these matters, Michael Wright, Carol Anne Huff, David Johanson, Angela Russo, Jeremy

Liss, Natalia Sokolova, Jeff Quinn, Charla Willian, Helen Griffiths, Seth Traxler,

Elisabeth Martin, and me.

8

I declare subject to penalty of perjury that the foregoing is true and correct.

Executed on December 8, 2010.

_____
Douglas C. Gessner, P.C.

# EXHIBIT A

EXECUTION COPY

## MANAGEMENT SERVICES AGREEMENT

This MANAGEMENT SERVICES AGREEMENT (the "Agreement"), dated as of February 2, 2006 (the "Effective Date"), is entered into by and among Indalex Holding Corp., a Delaware corporation (the "Company") with an address of 5200 Town Center Circle, Suite 470, Boca Raton, FL 33486, Indalex Limited, a Canada Corporation ("Indalex Limited") formed upon the amalgamation of 6461948 Canada Inc. and Indalex Limited with an address of 5675 Kennedy Road, Mississauga, Ontario, Canada L4Z 2H9, and Sun Capital Partners Management III, LP, a Delaware limited partnership (the "Manager") with an address of 5200 Town Center Circle, Suite 470, Boca Raton, FL 33486.

WHEREAS, the Company and its affiliates (including Indalex Limited) desire to receive financial and management consulting services from the Manager and to obtain the benefit of the experience of the Manager in business and financial management;

WHEREAS, the Manager desires to provide financial and management consulting services to the Company and its affiliates pursuant to the terms of this Agreement; and

WHEREAS, the compensation arrangements set forth in this Agreement are designed to compensate the Manager for providing such financial and management consulting services to the Company and its affiliates.

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, the parties hereto agree as follows:

1.    Agreement; Term.

(a)    The Company hereby retains the Manager to perform, and the Manager agrees to render to the Company and its affiliates, on the terms herein set forth, management and consulting services regarding the business of the Company and its affiliates and such other services relating to the Company and its affiliates as may from time to time be reasonably requested by the executive officers of the Company and agreed to by the Manager. Without limiting the generality of the foregoing, the parties currently contemplate that these services shall include advice regarding improvements to the Company's and its affiliates' financial reporting, accounting and management information systems and staffing.

(b)    It is expressly understood and agreed that the Manager shall devote only so much time, and shall consult with and advise the officers and managers of the Company and its affiliates only to such extent and at such times and places as may be mutually acceptable to the Company and the Manager. The Manager shall be free to provide similar services to such other business enterprises or activities as the Manager may deem fit without any limitation or restriction whatsoever.

(c)    The term of this Agreement shall commence as of the Effective Date and shall terminate on the tenth anniversary of the Effective Date. Notwithstanding any other provisions hereof, (i) the Company's obligation to pay amounts due with respect to periods prior

to the termination hereof and (ii) the provisions of Sections 3 through 18 hereof shall survive any termination of this Agreement.

2.    Compensation and Expenses.

(a)    For the services to be rendered by the Manager hereunder, the Manager shall receive an annual fee (the "Management Fee") equal to the greater of (i) $1,000,000 and (ii) 2% of EBITDA (as such term is hereinafter defined), computed without taking into consideration the fees payable under this Section 2, as determined by the Company's regular auditors, or in the absence thereof, by the Company's managing member, with respect to each fiscal year. The Company shall pay the Management Fee in quarterly installments in advance equal to the greater of (i) $250,000 and (ii) 2% of EBITDA (as such term is hereinafter defined) for the immediately preceding fiscal quarter, computed without taking into consideration the fees payable under this Section 2. At the end of each fiscal year during the term of this Agreement, following an audit of the Company's financial statements for such fiscal year: (x) in the event the Company paid the Manager an amount less than the greater of (i) $1,000,000 and (ii) 2% of EBITDA for such fiscal year (the "Audited Management Fee"), the Company shall promptly pay to the Manager the difference between the Audited Management Fee and the Management Fee actually paid with respect to such fiscal year (the greater of (i) and (ii), the "Actual Management Fee"); and (y) in the event the Actual Management Fee is greater than the Audited Management Fee for such fiscal year, the Company shall receive a credit against the immediately succeeding quarterly installment or installments, as applicable, for the difference between the Actual Management Fee and the Audited Management Fee. On the date hereof, the Company shall pay the Manager $250,000, representing the pro rata portion of the Management Fee for the quarter ending March 31, 2006. For purposes of this Agreement, the term "EBITDA" means, for any period, the sum of the amounts for such period of (A) net income (or loss) after taxes of the Company and its affiliates (including Indalex Limited) on a consolidated basis ("Net Income"), plus (B) interest expense which has been deducted in the determination of Net Income, plus (C) federal, state, provincial and local taxes which have been deducted in determining Net Income, plus (D) depreciation and amortization expenses which have been deducted in determining Net Income, including without limitation amortization of capitalized transaction expenses incurred in connection with the acquisition of all the issued and outstanding capital stock of Indalex Inc., a Delaware Corporation, by the Company and Indalex Limited by 6461948 Canada Inc. (the "Indalex Acquisition"), plus (E) extraordinary losses which have been deducted in the determination of Net Income, plus (F) uncapitalized transaction expenses incurred in connection with the Indalex Acquisition, plus (G) all other non-cash charges, minus (H) extraordinary gains which have been included in the determination of Net Income. Each item used in calculating EBITDA shall be determined in accordance with generally accepted accounting principles, consistent with that used in prior periods.

(b)    The Company shall reimburse the Manager for the cost of all reasonable out-of-pocket fees and expenses incurred by the Manager and its affiliates in the performance of the services hereunder and all matters related thereto.

(c)    In connection with additional management services required in connection with certain corporate events, the Manager shall also be entitled to additional customary and reasonable fees for management consulting services provided to the Company or to any of its direct or indirect subsidiaries or shareholders, including with respect to, without limitation,

- 2 -

refinancings, restructurings, equity or debt offerings, acquisitions, mergers, consolidations, business combinations, sales and divestitures (each a "Management Consulting Event"). In the event that at any time during the term hereof, there shall occur a Management Consulting Event involving the Company or any of the Company's direct or indirect subsidiaries or shareholders, the Company shall pay the Manager a management consulting fee, in cash, equal to 1% of the aggregate consideration (including assumed debt and long-term liabilities) paid to or by the Company or to or by any of its direct or indirect subsidiaries or shareholders in consideration for the Manager's performance of management consulting services in connection with such Management Consulting Event. The Manager and the Company acknowledge and agree that, in connection with the closing of the Indalex Acquisition, the Manager shall be entitled to receive a management consulting fee from the Company only equal to $4,650,000.

(d)     If for any reason the Company is unable to pay any or all of the amounts otherwise owed to the Manager pursuant to this Agreement, the Company shall make such payments as soon as the Company is able to do so.

3.     Allocation of Services Performed among Canada and United States.

(a)     The Company shall allocate all amounts payable hereunder on a reasonable basis to reflect (i) the relative portion of services provided hereunder that are performed inside and outside Canada, and (ii) those amounts payable which are for the benefit of the affiliates of the Company which are organized in Canada, including Indalex Limited (each a "Canadian Subsidiary"). To the extent an amount is paid by the Company that is for the benefit of a Canadian Subsidiary, the Company will be considered to have incurred that amount as agent for and on behalf of such Canadian Subsidiary.

(b)     To the extent that an amount is payable in respect of services that are performed inside Canada, such amount shall be subject to withholding as required by Regulation 105 under the *Income Tax Act* (Canada) ("Regulation 105") (which is currently 15%), provided that no withholding as described in this subsection (b) will be made if the Manager provides the Company with a withholding tax waiver issued by the Canada Revenue Agency in respect of amounts payable hereunder. Any amount withheld hereunder will be remitted to the Receiver General for Canada for the respective accounts of the members of the Manager pursuant to the provisions of the *Income Tax Act* (Canada) and the Regulations thereunder.

(c)     If the Company is required to withhold any amount under Regulation 105 as described in subsection (b), the amount payable under this Agreement shall be increased as necessary so that, after making all required withholdings (including withholdings applicable to additional amounts under this Section 3), the Manager receives an amount equal to the sum it would have received had no such withholding been made.

(d)     If, following any withholding as contemplated in this Section 3 in respect of which the Company is required to make an additional payment pursuant to subsection (c), any member of the Manager receives or is granted a refund of or a credit against or remission for any taxes paid or payable by him or on his account or a deduction in computing income or other such relief, the Manager will reimburse the Company with such amount as the Manager shall have concluded, in its absolute discretion but in good faith, to be the amount or value of the relevant relief.

- 3 -

K&E 10795509.5

4.     Relationship of the Parties. The Manager is providing services hereunder as an independent contractor, retaining control and responsibility for its operations and personnel. Nothing in this Agreement shall be deemed to constitute the parties hereto joint venturers, partners or participants in an unincorporated business or other separate entity, nor in any manner create any employer-employee relationship between the Company or Indalex Limited, on the one hand, and the Manager or any of the Manager's employees on the other hand.

5.     Directors and Officers. Nothing in this Agreement shall be construed to relieve the directors or officers of the Company or its affiliates from the performance of their respective duties or limit the exercise of their powers in accordance with the Company's (or such affiliate's) Articles of Incorporation or Bylaws, any applicable provisions of the applicable corporate law, or otherwise. The activities of the Company (or such affiliate) shall at all times be subject to the control and direction of its directors and officers. The Company (or such affiliate) reserves the right to make all decisions with regard to any matter upon which the Manager has rendered its advice and consultation.

6.     Limitation of Liability. Neither the Manager nor any of its affiliates, members, managers, partners, directors, officers, employees, agents and controlling persons (collectively, the "Manager Indemnitees") shall be liable to the Company or any of its subsidiaries or affiliates or any of the security holders or creditors of the Company or any of its affiliates for any (i) damage, loss, liability, deficiency, diminution in value, action, suit, claim, proceeding, investigation, audit, demand, assessment, fine, judgment, cost and other expense (including, without limitation, reasonable legal fees and expenses) directly or indirectly (whether direct or indirect, in contract or tort or otherwise) arising out of, related to, caused by, based upon or in connection with the performance of services contemplated by this Agreement unless such damage, loss, liability, deficiency, diminution in value, action, suit, claim, proceeding, investigation, audit, demand, assessment, fine, judgment, cost and other expense (including, without limitation, reasonable legal fees and expenses) shall be proven to result directly from the willful misconduct of such person or (ii) any Outside Activities (as defined in Section 17 below). In no event will any Manager Indemnitee be liable to the Company for special, indirect, punitive or consequential damages, including, without limitation, loss of profits or lost business, even if such Manager Indemnitee has been advised of the possibility of such damages. Under no circumstances will the liability of the Manager Indemnitees exceed, in the aggregate, the fees actually paid to the Managers hereunder.

7.     Indemnification. The Company shall reimburse, defend, indemnify and hold the Manager Indemnitees, harmless from and against any damage, loss, liability, deficiency, diminution in value, action, suit, claim, proceeding, investigation, audit, demand, assessment, fine, judgment, cost and other expense (including, without limitation, reasonable legal fees and expenses) arising out of, related to or in connection with (a) any act or omission of, or on behalf of, the Company, the Manager or any of the Manager Indemnitees, except to the extent proven to result directly from the willful misconduct of the person seeking indemnification, or (b) any act or omission made at the direction of the Company.

8.     Notices. Any notice, request, demand or other communication permitted or required to be given hereunder shall be in writing, shall be sent by one of the following means to the addressee at the address set forth in the preamble to this Agreement (or at such other address

- 4 -

as shall be designated hereunder by notice to the other party hereto, effective upon actual receipt) and shall be deemed conclusively to have been given: (a) on the first business day following the day timely deposited with a nationally recognized overnight delivery service with an order for next-day delivery, with the cost of delivery prepaid for the account of the sender; (b) on the fifth business day following the day duly sent by certified or registered United States mail, postage prepaid and return receipt requested; or (c) if delivered by other means, when actually received by the addressee on a business day (or on the next business day if received after the close of normal business hours or on any non-business day).

9.      Assignment; Successors and Assigns.  This Agreement and the rights, duties and obligations of the Company hereunder may not be assigned or delegated by the Company without the prior written consent of the Manager.  This Agreement and the rights, duties and obligations of the Manager hereunder may not be assigned or delegated by the Manager, other than to an affiliate of the Manager, without the prior written consent of the Company.  All covenants, promises and agreements by or on behalf of the parties contained in this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

10.      Amendments.  No amendment, supplement or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Manager and the Company (in the case of an amendment or supplement) or by the waiving party (in the case of a waiver).

11.      Applicable Law.  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to principles of conflicts of law or choice of law that would compel the application of the substantive laws of any other jurisdiction.  EACH PARTY HERETO HEREBY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT, OR THE VALIDITY, PROTECTION, INTERPRETATION, COLLECTION OR ENFORCEMENT THEREOF.

12.      Section Headings.  The headings of each section are contained herein for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

13.      Entire Agreement.  This Agreement sets forth the entire agreement of the parties hereto with regard to the subject matter hereof and supersedes and replaces all prior agreements, understandings and representations, oral or written, with regard to such matters.

14.      Severability.  If any provision of this Agreement or application thereof under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect any other provision or application of this Agreement which can be given effect without the invalid or unenforceable provision or application and shall not invalidate or render unenforceable such provision or application in any other jurisdiction.  If any provision is held void, invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances.

- 5 -

15. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be an original, and both of which together shall constitute one and the same document. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

16. <u>Further Assurances</u>. Each party hereto agrees to use all reasonable efforts to obtain all consents and approvals, and to do all other things, necessary for the transactions contemplated by this Agreement. The parties agree to take such further action and to deliver or cause to be delivered any additional agreements or instruments as any of them may reasonably request for the purpose of carrying out this Agreement and the agreements and transactions contemplated hereby.

17. <u>Attorneys' Fees</u>. In any action or proceeding brought to enforce any provision of this Agreement, or where any provision hereof is validly asserted as a defense, the prevailing party, as determined by the court, shall be entitled to recover reasonable attorneys' fees in addition to any other available remedy.

18. <u>Outside Activities</u>. The Company hereby acknowledges and agrees that one or more of the Manager Indemnitees have had, and from time to time may have, outside activities or interests that conflict or may conflict with the best interests of the Company (collectively, "Outside Activities"), including (without limitation) investment opportunities or investments in, ownership of, or participation in entities that are or could be complementary to, or competitive with, the Company. The Company hereby consents to all such Outside Activities.

19. <u>Construction</u>. The construction of this Agreement shall not take into consideration the party who drafted or whose representative drafted any portion of this Agreement, and no canon of construction shall be applied that resolves ambiguities against the drafter of a document.

20. <u>Currency and Payments</u>. All dollar amounts specified herein are denominated in United States dollars, and all payments to be made pursuant to this Agreement shall be made in United States dollars.

[SIGNATURES ON NEXT PAGE]

K&E 10795509.5

IN WITNESS WHEREOF, the parties have executed this Management Services Agreement as of the date first above written.

SUN CAPITAL PARTNERS
MANAGEMENT III, LP

By: Sun Capital Partners
Management III, LLC
Its: General Partner

By: _____
Name: MICHAEL MCCONAGHY
Title: VICE PRESIDENT

INDALEX HOLDING CORP.

By: _____
Name: M. STEVEN LIPP
Title: VICE PRESIDENT

INDALEX LIMITED

By: _____
Name:
Title:

K&E 10795509.5

A50

IN WITNESS WHEREOF, the parties have executed this Management Services Agreement as of the date first above written.

SUN CAPITAL PARTNERS
MANAGEMENT III, LP

By: Sun Capital Partners
Management III, LLC
Its:  General Partner

By:_____
Name:
Title:


INDALEX HOLDING CORP.

By:_____
Name:
Title:


INDALEX LIMITED

By: _____
Name: *Michael Alger*
Title: *EVP/CFO*

*Signature Page to Management Services Agreement*

K&E 10795509.5

# **EXHIBIT B**

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Douglas C. Gessner
To Call Writer Directly:
312 861-2140
dgessner@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200
Dir. Fax: 312 660-0305

February 2, 2006

<u>**PRIVILEGED & CONFIDENTIAL**</u>
<u>**FOR ADDRESSEE'S EYES ONLY**</u>

Indalex Holdings Finance, Inc.
75 Tri-State International, Suite 450
Lincolnshire, IL 60069

Attention: Michael Alger, Chief Financial Officer

Re:    <u>**Retention to Provide Legal Services**</u>

Dear Mr. Alger:

We are very pleased that you have asked us to represent Indalex Holdings Finance, Inc. and its subsidiaries and affiliates (collectively, "you" or "your") in connection with a variety of corporate, financing, contractual, commercial and related areas (the "Indalex Matters"). Please note that we do not represent your officers, directors or employees.

**General Terms.** This retention letter (the "Agreement") sets forth the terms of your retention of Kirkland & Ellis LLP (and an affiliated entity Kirkland & Ellis International LLP (collectively "K&E LLP")) to provide legal services and constitutes an agreement between us. The Agreement sets forth our entire agreement for rendering professional services for the current matter, as well as for all other existing or future matters, except where we otherwise agree in writing (*e.g.*, by signing a different retention letter).

**Personnel.** I will be primarily responsible for this engagement. Other attorneys and legal assistants also will perform services during the course of this engagement. We will involve such other lawyers and legal assistants in K&E LLP to the extent that your needs make such involvement desirable and acceptable to you.

**Fees.** Hourly rates vary with the experience and seniority of the individuals assigned, and the type of matter being handled, and may be adjusted by us from time to time. Our attorney billing rates presently range from $245 to $520 per hour for certain associates and from $520 to $850 per hour and up for our most experienced partners. Other legal billers include legal

London         Los Angeles         Munich         New York         San Francisco         Washington, D.C.
10901363_1.DOC

assistants, project assistants, and certain specialized personnel (*e.g.*, investigators, technical specialists, and the like). We reserve the right to change these rates from time to time.

While we will attempt to estimate fees to assist you in your planning if requested, such estimates are subject to change and are not binding unless otherwise expressly and unequivocally stated in writing.

**Expenses.** Expenses related to providing services shall be included in our statements as disbursements advanced by us on your behalf. Such expenses include photocopying, printing, scanning, witness fees, travel expenses, filing and recording fees, long distance telephone calls, certain secretarial overtime, and other overtime expenses, postage, express mail, and messenger charges, deposition costs, computerized legal research charges, and other computer services, and miscellaneous other charges. Our clients pay directly (and are solely responsible for) certain larger costs, such as consultant or expert witness fees and expenses, and outside suppliers or contractors' charges. By executing this Agreement below, you are agreeing to pay for all charges in accordance with the K&E LLP's schedule of charges, a copy of which is attached hereto, as revised from time to time.

**Billing Procedures.** Our statements for fees and expenses are typically rendered monthly and, unless other arrangements are made, payment in full is due upon receipt. We may adjust our billing cycle upon agreement with you. You may have the billing statement in any reasonable format you choose, but we will select an initial format for the statement unless you otherwise request in writing. Depending on the circumstances, however, estimated or summary bills may be provided during certain billing cycles, with supporting time descriptions and expense summaries to follow thereafter.

**Termination.** Our retention may be terminated by either of us at any time by written notice by or to you. Our representation will end at the earliest of (a) your termination of our representation, (b) our withdrawal, or (c) the substantial completion of our substantive work. We normally do not withdraw from a representation unless the client misrepresents or fails to disclose material facts, fails to pay fees or expenses, or makes it unethical or unreasonably difficult for us to continue to represent the client, or unless other just cause exists. If permission for withdrawal is required by a court, we shall apply promptly for such permission, and termination shall coincide with the court order for withdrawal. If this Agreement or our services are terminated for any reason, such termination shall be effective only to terminate our services prospectively and all the other terms of this Agreement shall survive any such termination.

Upon cessation of our active involvement in a particular matter (even if we continue active involvement in other matters on your behalf), we will have no further duty to inform you of future developments or changes in law as may be relevant to such matter. Further, unless you and we mutually agree in writing to the contrary, we will have no obligation to monitor renewal or notice dates or similar deadlines that may arise from the matters for which we had been retained.

**Cell Phone and E-Mail Communication.** K&E LLP hereby informs you and you hereby acknowledge that K&E LLP's attorneys sometimes communicate with their clients and their clients' professionals and agents by cell telephone, that such communications are capable of

- 2 -

10901363_1.DOC

being intercepted by others and therefore may be deemed no longer protected by the attorney-client privilege, and that you must inform K&E LLP if you do not wish K&E LLP to discuss privileged matters on cell telephones with you or your professionals or agents.

K&E LLP hereby informs you and you hereby acknowledge that K&E LLP's attorneys sometimes communicate with their clients and their clients' professionals and agents by unencrypted e-mail, that such communications are capable of being intercepted by others and therefore may be deemed no longer protected by the attorney-client privilege, and that you must inform K&E LLP if you wish to institute a system to encode all e-mail between K&E LLP and you or your professionals or agents.

**File Retention.** All records and files will be retained and disposed of in compliance with our policy in effect from time to time. Subject to future changes, it is our current policy generally not to retain records relating to a matter for more than five years. Upon your prior written request, we will return client records to you prior to their destruction. It is not administratively feasible for us to advise you of the closing of a matter or the disposal of records. We recommend, therefore, that you maintain your own files for reference or submit a written request for your client files promptly upon conclusion of a matter.

**Conflicts of Interest.** As is customary for a law firm of our size, you currently have relationships with numerous business entities that K&E LLP has represented or currently represents in matters unrelated to you. Because you are engaged in activities (and may in the future engage in additional activities) in which your interests may diverge from those of our other clients, the possibility exists that one of our clients may take positions adverse to you.

In any current or future matter not substantially related to our work for you in which K&E LLP represents another client (either an existing client or future client) who is adverse to you, including but not limited to litigation or adversary proceedings directly adverse to you or your related entities, you waive and will waive any such conflict of interest or other objection that may exist. Accordingly, our representation of you will be with the understanding that you waive any conflict of interest that is or may be considered adverse to you or your related entities with respect to any current or future clients of K&E LLP in any current or future matter not substantially related to our work for you.

In addition, because we represent a number of venture capital, leveraged buy-out and other private equity and mezzanine investors, from time to time more than one of our clients participate as bidders or buyers in an auction or other opportunity to buy or invest in the assets or securities of a third party (a "Sale"). In such case, we establish appropriate screening procedures to insure that there is absolutely no disclosure of confidential information concerning the Sale from the team of lawyers representing one client to the completely separate team of lawyers representing another client. In the event that you seek representation by us in such a Sale, you agree to waive prospectively any conflict of interest or other objection that would preclude our representation of another client(s) in the same Sale so long as we establish appropriate screening procedures to prevent disclosure of confidential information concerning our representation of you, and assign a completely separate team of lawyers to assist you.

- 3 -

10901363_1.DOC

A55

As you know, we have represented and represent Sun Capital Partners, Inc. and its affiliated investment funds and management companies (together, "Sun") on a variety of matters, including Sun's investment in you and anticipate that we will represent Sun in future matters. You are a portfolio company of Sun. This confirms that K&E LLP has informed you of its representation of Sun on a variety of matters, including Sun's investment in you, and that you consent to, and waive any conflict or other objection with respect to K&E LLP's representation of Sun, its affiliates or portfolio companies in connection with any and all (i) matters in which K&E LLP currently represents Sun, its affiliates or portfolio companies, including the Indalex Matters, (ii) past matters in which K&E LLP represented you, Sun, Sun's affiliates or Sun's portfolio companies (or any combination thereof) and (iii) future matters in which K&E LLP might represent Sun (whether or not such matter is related to the Indalex Matters). You also agree that K&E LLP's representation is solely of you, and no other person (other than Sun) has the status of a client for conflict of interest purposes in connection with the Indalex Matters. In addition, you understand and agrees that in the event that K&E LLP or Sun determine that any conflict exists in connection with K&E LLP's representation of you, K&E LLP may terminate its representation of you and continue its representation of Sun in any matter (whether or not such matter is related to the Indalex Matters). All files relating to Sun, its affiliates or portfolio companies will be kept confidential and unavailable to you. In addition, we will not be obligated to disclose to you any confidential information of Sun, its affiliates or portfolio companies that K&E LLP learns in the process of representing Sun, its affiliates or portfolio companies.

**No Guarantee of Success.** It is impossible to provide any promise or guarantee about the outcome of your matters. Nothing in this Agreement or any statement by our staff or attorneys constitutes a promise or guarantee. Any comments about the outcome of your matter are simply expressions of judgment and are not binding on us.

**Consent to Use of Information.** In connection with future materials that, for marketing purposes, describe facets of our law practice and recite examples of matters we handle on behalf of clients, you agree that, if those materials avoid disclosing your confidences and secrets as defined by applicable ethical rules, they may identify you as a client, may contain factual synopses of your matters, and may indicate generally the results achieved.

**Reimbursement of Expenses.** You agree promptly to reimburse us for all fees and expenses, including the amount of K&E LLP's attorney and paralegal time at normal billing rates, as incurred by us in connection with participating in, preparing for, or responding to any action, claim, suit or proceeding brought by or against any third-party that relates to the legal services provided by us under the Agreement. Without limiting the scope of the foregoing, and by way of example only, this paragraph extends to all such fees and expenses incurred by us in responding to document subpoenas, and preparing for and testifying at depositions and trials.

**Indemnification.** You agree to indemnify K&E LLP, its partners, associates and of counsel for any and all losses incurred as a result of any legal proceeding or claim, including but not limited to any lawsuit, investigation, or administrative, regulatory or legislative proceeding brought by any person or entity (other than any claim brought by you against K&E LLP) in connection with or as a result of the legal services provided by us under the Agreement ("Applicable Action"). The term losses means any and all damages, penalties, expenses, and fees, including reasonable attorney's fees incurred by K&E LLP, its partners, associates and of

- 4 -

counsel in an Applicable Action.  You will not be responsible, however, for any losses incurred by K&E LLP, its partners, associates and of counsel to the extent that such losses are finally judicially determined to result from our own gross negligence or willful misconduct.  Your responsibility to indemnify K&E LLP, its partners, associates and of counsel shall extend to any and all losses incurred in an Applicable Action, even if such an action is brought after the completion or termination of our representation of you.

**LLP.**  Kirkland & Ellis LLP is a limited liability partnership organized under the laws of Illinois, and Kirkland & Ellis International LLP is a limited liability partnership organized under the laws of Delaware.  Pursuant to those statutory provisions, an obligation incurred by a limited liability partnership, whether arising in tort, contract or otherwise, is solely the obligation of the limited liability partnership, and partners are not personally liable, directly or indirectly, by way of indemnification, contribution, assessment or otherwise, for such obligation solely by reason of being or so acting as a partner.

**Miscellaneous.**  This Agreement sets forth our entire agreement for rendering professional services.  It can be amended or modified only in writing and not orally or by course of conduct.  Each party signing below is jointly and severally responsible for all obligations due us and represents that each has full authority to execute this Agreement so that it is binding.  This Agreement may be signed in one or more counterparts and binds each party countersigning below, whether or not any other proposed signatory ever executes it.  If any provision of this Agreement or the application thereof is held invalid or unenforceable, the invalidity or unenforceability shall not affect other provisions or applications of this Agreement which can be given effect without such provisions or application, and to this end the provisions of this Agreement are declared to be severable.

We are not advising you with respect to this Agreement because we would have a conflict of interest in doing so.  If you wish advice, you should consult independent counsel of your choice.

- 5 -

10901363_1.DOC

A57

Please confirm your agreement with the arrangements described in this letter by signing below and returning it to me via fax at 312-660-0305.

Very truly yours,

KIRKLAND & ELLIS LLP

By _____
Douglas C. Gessner
Partner

Agreed to and accepted this ___2nd___ day of February, 2006.

INDALEX HOLDINGS FINANCE, INC.

By: _____
Michael Alger
Chief Financial Officer

- 6 -

Attachment

# KIRKLAND & ELLIS LLP

### CLIENT-REIMBURSABLE EXPENSES

- **Duplicating/Printing:** 10¢ per page (15¢ per page for copies/printing done in the New York office and 20¢ per page for copies/printing done in the London office). Scanned images are 15¢ per page. Color copies and special copying (CDs, videotapes, velobinding, oversized copies, etc.) are charged based upon our approximate costs.

- **Secretarial and Word Processing:** Clients are not charged for secretarial and word processing expenses incurred on their matters during the normal workday.

- **Overtime Charges:** Secretarial and word processing overtime costs are not passed on to clients unless either (i) the client has specifically requested the after-hours work or (ii) the nature of the work being done for the client necessitates the overtime and such work could not have been done during normal working hours. Costs for related overtime meals and transportation are charged to the client only under the same conditions.

- **Travel Expenses:** We charge clients only our out-of-pocket costs for travel expenses. We charge only coach fares unless the client has pre-approved first-class or an upgrade. K&E personnel take advantage, to the extent practical, of any airfare discounts available at the time of ticketing and are instructed to incur only reasonable hotel and meal expenses. K&E negotiates, uses, and passes along volume discount hotel and air rates whenever possible and practical.

- **Telephone:** We do not charge for local telephone calls. We charge clients for long distance telephone calls at the standard rates of our primary long distance provider.

- **Overnight Delivery/Postage:** We charge clients for the actual cost of overnight and special delivery (*e.g.*, Express Mail and FedEx), and U.S. postage for materials mailed on the client's behalf. K&E negotiates, uses, and passes along volume discount rates whenever possible.

- **Messengers:** We charge clients for the actual cost of a third party vendor messenger. Where a K&E in-house messenger is used, we charge clients a standard transaction charge (*e.g.*, $18 in Chicago).

- **Faxes:** We do not charge clients for inbound faxes or for local telephone charges incurred on either inbound or outbound faxes. For outgoing faxes, we charge 75¢ per page, plus the standard rates of our primary long distance provider for any related long-distance phone calls.

- 1 -

10901363_1.DOC

- **Computerized Research Services:** Client charges are limited to K&E's actual third-party costs and do not include any surcharges for related overhead. K&E negotiates, uses, and passes along volume discount rates whenever possible.

- **Off-Site Legal Files Storage:** Clients are not charged for off-site storage of files unless the storage charge is specifically approved in advance.

- **Document Procurement:** Our standard client charge for document retrieval when a K&E library employee obtains a document from outside sources is $25 per document. There is no client charge for retrieving documents from K&E libraries in other cities or from other collections when the document is part of the K&E collection but unavailable.

- **Calendar Court Services:** Our standard charge is $25 for a court filing and other court services or transactions.

- **Library and Business/Industry Research Services:** Research specialists perform computerized research services at the request of attorneys, and clients are charged per hour for these services.

- **Supplies:** There is no client charge for standard office supplies. Clients are charged only for special items (*e.g.*, a minute book, exhibit tabs/indexes/dividers, binding, etc.) and then only at K&E's actual cost.

- **Contract Attorneys and Contract Non-attorney Billers:** If there is a need to utilize a contract attorney or contract non-attorney on a client engagement, clients shall be informed when a bill includes charges for such personnel. Such charges are based on the nature of the task performed and the level of experience of the individual providing the services.

- **Other Third Party Expenditures:** Other third party expenditures (*e.g.*, corporate document and lien searches, SEC and regulatory filings, etc.) incurred on behalf of a client, will be passed through to the client at actual cost.

10901363_1.DOC

**EXHIBIT "8"**
**TO MEMORANDUM OF LAW IN SUPPORT OF**
**KIRKLAND & ELLIS LLP'S MOTION FOR**
**SUMMARY JUDGMENT**

**THIS DOCUMENT IS FILED UNDER SEAL**
**PURSUANT TO PROTECTIVE ORDER AND**
**CONFIDENTIALITY AGREEMENT**
**[ENTERED ON JUNE 18, 2015; ADV. DOCKET NO. 66]**

**EXHIBIT "9"**
**TO MEMORANDUM OF LAW IN SUPPORT OF**
**KIRKLAND & ELLIS LLP'S MOTION FOR**
**SUMMARY JUDGMENT**

**THIS DOCUMENT IS FILED UNDER SEAL**
**PURSUANT TO PROTECTIVE ORDER AND**
**CONFIDENTIALITY AGREEMENT**
**[ENTERED ON JUNE 18, 2015; ADV. DOCKET NO. 66]**

# EXHIBIT "10"

## KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Douglas C. Gessner
To Call Writer Directly:
312 861-2140
dgessner@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200
Dir. Fax: 312 660-0305

June 8, 2004

C. Deryl Couch
Senior Vice President and General Counsel
Sun Capital Partners, Inc.
5200 Town Center Circle
Suite 470
Boca Raton, FL 33486

Dear Deryl:

You have invited investment entities (each, an "investment entity"), formed by lawyers of Kirkland & Ellis LLP and its affiliated partnerships ("K&E"), to co-invest from time to time along with Sun Capital Partners, Inc. and/or other funds managed now or in the future by you or your affiliates (each, a "PE Fund"). Your invitation to invest is not a condition to our willingness to provide legal services.

State ethics rules established by the jurisdictions in which K&E has offices require that a lawyer make disclosures and obtain written consent for certain business transactions with a client, regardless of whether the lawyer represents the client in connection with the specific business transaction. These rules generally correspond to Rules 1.7 and 1.8(a) of the Model Rules of Professional Conduct attached.

We want to assure you that any legal advice that K&E might render to you, whether now or in the future, will not be adversely affected by the existence or nonexistence of an investment entity's investment. In accordance with the principles of Rule 1.7, we note that other persons may assert in the future that an investment entity's investment creates, in certain circumstances, a conflict between K&E's exercise of its independent professional judgment in rendering advice to you and the financial interest of attorneys participating in the investment entity, and such other persons might seek to limit your ability to use K&E to advise you on a particular matter. While we cannot control what a person might assert or seek, we do not believe that K&E's judgment will be compromised by virtue of the investment.

As required by the principles of Rule 1.8(a), you acknowledge that we have reviewed this letter and the attachments with you, we have advised you of the matters referenced in the attachments, you have had the opportunity to ask questions, and you will be fully aware of the

London          Los Angeles          New York          San Francisco          Washington, D.C.

DEP. EX. NO. 21
FOR I.D., AS OF  5-22-14

KEADV00424857

KIRKLAND & ELLIS LLP

C. Deryl Couch
June 8, 2004
Page 2

terms of each future co-investment by an investment entity along with a PE Fund since you will be negotiating such terms with the target company. As you know, K&E is not representing you in connection with matters specifically between you and the investment entity, even though K&E may be representing you in connection with all other co-investors and other related and unrelated matters.

By signing below, you confirm that you have reviewed this letter, understand the disclosures made and are providing the requested consents.

We value your client relationship and appreciate your cooperation in this matter.

Very truly yours,

Douglas C. Gessner

Consented to on behalf of the
undersigned and its affiliates:

SUN CAPITAL PARTNERS, INC.

By: _____
     C. Deryl Couch
     Senior Vice President and General Counsel

KEADV00424858

## EXHIBIT
### Rule 1.7 (excerpts)

1.    Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves...a significant risk that the representation...will be materially limited by...a personal interest of the lawyer.

2.    Notwithstanding the existence of a...conflict of interest under paragraph (a), a lawyer may represent a client if:

    *(1)    The lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;...*

    *(4)    Each affected client gives informed consent, confirmed in writing.*

### Rule 1.8(a) (excerpts)

1.    A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

    *(1)    the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;*

    *(2)    the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent counsel on the transaction; and*

    *(3)    the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.*

KEADV00424859

**EXHIBIT "11"**
**TO MEMORANDUM OF LAW IN SUPPORT OF**
**KIRKLAND & ELLIS LLP'S MOTION FOR**
**SUMMARY JUDGMENT**

**THIS DOCUMENT IS FILED UNDER SEAL**
**PURSUANT TO PROTECTIVE ORDER AND**
**CONFIDENTIALITY AGREEMENT**
**[ENTERED ON JUNE 18, 2015; ADV. DOCKET NO. 66]**

# EXHIBIT "12"

# Indalex Aluminum Solutions Group

| | |
|---|---|
| **To:** | Marc J. Leder and Rodger R. Krouse |
| **From:** | Steven Liff, Matthew Garff and Peter Lee |
| **Date:** | July [20], 2005 |
| **Meeting:** | [ ] |
| **Attendees:** | [Steven Liff, Matt Garff and Peter Lee] |

## Situation Overview

Indalex Aluminum Solutions Group ("Indalex" or the "Company") was formerly a division of Novar plc ("Novar"), which Honeywell International Inc. ("Honeywell") acquired in March 2005.  In Honeywell's announcement to acquire Novar in December 2004, Honeywell disclosed that it did not intend to hold Indalex and expected to pursue strategic alternatives as soon as practicable.

J.P. Morgan Securities Inc. ("JPMorgan") has been engaged by Honeywell to act as its exclusive financial advisor in offering Indalex for sale.  Honeywell intends to structure the proposed transaction as a sale of the shares of Indalex Inc., a Delaware corporation ("Indalex U.S."), and Indalex Limited, a Canadian corporation ("Indalex Canada").  Indalex U.S. and Indalex Canada and their respective subsidiaries (including a 25% ownership interest in Asia Aluminum Group ("AAG"), held indirectly by Indalex Canada) comprise the entirety of the aluminum extrusion business as operated by Novar plc.  Excluding certain pension liabilities, Honeywell expects that the purchaser will retain all liabilities of Indalex U.S. and Indalex Canada and their respective subsidiaries.

**We would like to get your thoughts with regards to an acquisition of Indalex Aluminum Solutions Group, specifically related to the opportunities and risks associated with the acquisition.**

## Company Overview

Indalex, headquartered in Chicago, Illinois, is the largest independent producer of soft alloy extrusion products and the second largest aluminum extruder in North America.  The Company's aluminum extrusion products are widely used throughout industrial, commercial and residential applications and are customized to meet specific end-user requirements.  The Company operates 41 extrusion presses at 16 extrusion plants which support approximately 800 pounds of total capacity (the Company is currently operating at lower than full capacity) along with nine electrostatic state-of-the-art paint lines and five anodizing operations.  As of May 2005, Indalex maintained 3,393 total employees with an average employee tenure of 9.4 years (see section titled "Employees" on page 7 for additional details).  In addition to its North American operations, the Company has established an important Chinese relationship through its acquisition in FY2001A of a 25% interest in AAG, Asia's largest aluminum extruder, for approximately $68 million (see section titled "Strategic Alliance with Asia Aluminum Group" on page 5 for additional details).  Sourcing quality extrusion products from China offers Indalex customers a cost benefit over North American production and also represents security of supply.  Indalex is the only North American aluminum extruder that can offer this benefit.

Indalex has increased its competitive position by approximately 2.4% since FY2000A and has improved productivity by over 40% over the past four years.  Financial performance is effectively driven by the conversion of aluminum billet into extrusion products.  The value associated with such conversion, which is defined as selling price over material cost, is referred to as gross value added ("GVA").  For the last twelve months ended June 30, 2005A, the Company generated revenue, GVA and pro forma EBITDA of $983.7 million, $385.9 million and $$[81.3] million, respectively.  For the projected fiscal year ending December 31,

2005E, the Company is expected to generate revenue, GVA and pro forma EBITDA of $1.0 billion, $390.6 million and $[87.9] million, respectively.

## Aluminum Extrusion Process Overview

The following chart illustrates the extrusion process of an aluminum billet into a finished product:

**Extrusion Process Map**



Source: Company management as provided in the Indalex management presentation.

▶ Extrusion process begins in one of two forms:

- Once the shape of the final product has been identified, the proper alloy selected and the die prepared for the actual extrusion process, the aluminum billet is preheated in a heating furnace for softening. The billet is crushed in the extrusion press which applies pressure to the billet against the die. As the pressure increases, the soft (but still solid) metal is squeezed out through the shaped orifice of the die to emerge on the other side as a fully formed profile.

- Aluminum billet is casted into scrap for raw aluminum material to recycle into alloy logs or cut-to-length billet.

▶ Profile is passed through a saw and sent through a stretcher after the profile has been quenched (cooled) to straighten the extrusion and correct any twisting that may have occurred subsequent to extrusion.

▶ Finish cut saw is used to cut the profile to the specified commercial length before sending the product through an aging oven.

▶ Controlled heating through an aging oven induces artificial aging such that extrusion alloys reach their optimal strength.

- When the profile emerges from the press, it is in a semi-solid state but rapidly solidifies as it cools or is quenched (whether by air or water).

▶ Product is either painted and/or fabricated and completed product is shipped.

## Product Offerings

Indalex products are primarily made-to-order and include custom extrusion, painting and anodizing, fabricated components, drawn tube and electrical conduit.  Finished products are sold primarily into the building materials, transportation, consumer durables, machinery and equipment and electrical sectors.  The following table illustrates the Company's comprehensive product offering.

| Custom Extrusion | Paint | Anodizing | Fabricated Components | Electrical Conduit | Aluminum Billet |
|---|---|---|---|---|---|
| ▶ Solid, semi-hollow and hollow shapes<br>▶ High precision and tight tolerances<br>▶ Elongated products or short parts cut from lengthy extrusions<br>▶ Parts that self-assemble<br>▶ Parts that interlock<br>▶ Parts that hinge | ▶ Ability to provide virtually any color and finish<br>▶ 9 Paint lines across North America<br>▶ Full range of acrylic, polyester and high-performance fluoropolymer paints<br>▶ Adding powder coat capability | ▶ Full range of anodizing capabilities, including Bright Dip<br>▶ Specialty finishes, such as spiral graining, brushed nickel and buffing as well as architectural anodizing | ▶ Fabrication capabilities – from concept design assistance to a finished, ready-to-assemble part<br>▶ Helps customers accelerate product development cycles, consolidate parts, eliminate secondary operations, reduce assembly time and improve total quality | ▶ Indalex Rigid Aluminum Conduit meets same UL, ANSI and Federal codes as rigid steel<br>▶ Tight material specifications that exceed the industry requirement<br>▶ Provides superior corrosion resistance and usable product life | ▶ Offers in-house billet casting across the United States and Canada<br>▶ Recycle scrap metal into 6000 Series alloy logs or cut-to-length billet to reduce material costs while maintaining quality<br>▶ Serve own extrusion plants as well as external customers |

Source: Company management as provided in the Indalex management presentation.

**Aluminum Extrusions**

Indalex offers both custom and standard aluminum extrusions in a variety of shapes, including solid, semi-hollow and hollow designs.  These shapes are offered as elongated products or short parts cut from lengthy extrusions and can be produced with high precision and tight tolerance.  The Company supports custom shapes with specifically-engineered dies to meet the specified requirements, including parts that hinge, parts that interlock and parts that self-assemble.

**Paint**

Indalex is North America's leading painter of extruded aluminum with nine state-of-the-art paint lines in the United States and Canada.  The majority of the Company's paint lines have multiple paint booths, providing quicker throughput for multi-coat applications such as Kynar®, a high value-added paint used in commercial building and construction applications.  The Company's strategic partnership with a leading paint supplier provides even deeper technical expertise and access to the latest innovations.  Indalex has the ability to supply small batches of custom color or high volume runs on standard colors, using all types of liquid paint from acrylic to polyester to fluoropolymer finishes.  To further enhance current finishing capabilities, the Company is in process of adding the first vertical powder coating line in the United States, enabling the Company to produce high volume powder coated extrusion at a lower cost than the competition.

**Anodizing**

The Company offers a full range of anodizing capabilities, including basic etching, architectural anodizing and Bright Dip, which provides a polished, mirrored finish in a variety of colors.  The Company has four anodizing facilities across North America, each with a range of capabilities.  For high value-added sub-segments such as shower and tub enclosures, Indalex produces numerous specialty finishes, such as chemical and mechanical buffing and polishing and mechanical graining and sanding.  The Company also produces a brushed nickel finish that replicates the popular look of stainless steel at a lower cost.

Innovation is a hallmark of the Company's anodizing capability, bringing new finishes to high-end decorative product lines.

**Fabricated Products**

Indalex has the fabrication knowledge and tools to transform extruded aluminum into integral, precisely engineered components. The Company's fabrication capabilities range from assistance with concept design to the delivery of a finished, ready-to-assemble part.

**Electrical Conduit**

Indalex has been producing Rigid Aluminum Conduit for over 25 years. With tight material specifications that exceed the industry requirement, Indalex Rigid Aluminum Conduit provides superior corrosion resistance and usable product life. Indalex Rigid Aluminum Conduit material costs and labor costs are up to 40% and up to 70% less expensive than rigid steel, respectively. These two components can add up to significant savings, offering added value for Indalex customers.

**Aluminum Billet**

Indalex offers in-house billet casting capability across the United States and Canada. The Company recycles scrap metal into 6000 Series alloy logs or cut-to-length billet to reduce material costs while maintaining quality. The Company serves its own extrusion plants as well as third party customers across North America.

## Aluminum Price Volatility

Unlike a typical commodity metals business such as rolled steel or primary aluminum, extruded aluminum products are customized to meet end-user specific requirements and underlying commodity prices are passed on to the customer. Indalex is therefore insulated from aluminum price volatility. The Company's products are sold based on four different pricing structures:

► Formula Pricing (66% of sales) – Sum of the prior month London Metal Exchange ("LME"), Midwest Premium ("MWP") and a conversion margin

  ▪ London Metal Exchange – Prior month simple average of LME aluminum published cost

    – Set by supply-demand balance in the London Metal Exchange

    – While LME price volatility impacts the cost of extrusion, it is the extrusion customer that bears that impact

  ▪ Midwest Premium – Published prior month simple average of cost representing shipping and warehousing

  ▪ Conversion margin – Indalex negotiated cost representing extrusion and additional costs, including painting, fabricating, anodizing, shipping and dies

    – Impacted by customer switching capability, competitive response, industry-wide capacity and shift in end-user mix

    – Prices have been positive in FY2004A and YTD2005A after three years of negotiated reductions driven by tighter supply, pricing opportunities and competitive interest in increasing returns

    – Margins are recovering due to positive industry and Company pricing actions in FY2004A

► Catalog Pricing (12% of sales) – A set price which is usually applied towards the extrusion of custom shapes

  ▪ Prices are set by extrusion producers and are adjusted periodically to reflect changes in the aluminum commodity market

► Fixed Price Contract ("FPC") (17% of sales) – Customer is charged a flat price for a specific time period

  ▪ Typically offered as a "hedge" for a period (typically 12 months) against the LME and Midwest Premium

► Toll Conversion (5% of sales) – Customer provides ingot and is charged a conversion price only

## Customers

The Company's customer base is segmented into three distinct categories:

► <u>National accounts</u> – large, consolidated, multi-location buyers that typically require their suppliers to have nationwide sourcing, production and delivery capabilities.  Indalex is one of two aluminum extruders with the manufacturing capabilities to effectively serve these customers.

► <u>Regional accounts</u> – Traditionally have one or a number of locations within a close proximity and can be served through one manufacturing facility.

► <u>Indalex Direct</u> – Made up of smaller customers whose products contain a relatively low percentage of extruded aluminum as an overall component of its finished product.  These customers generally purchase lower volume quantities and value on-time delivery over price.  Sales within this segment are highly profitable and are frequently served by small, single facility suppliers.

## Strategic Alliance with Asia Aluminum Group

In October 2000, the Company formed a strategic alliance (the "Alliance") with Asia Aluminum Holdings Limited (OTC: AALHF.PK) ("AAH"), a Hong Kong public company with a market capitalization of USD $354.1 million[1] and the region's largest producer of extruded aluminum.  The Alliance was further strengthened in FY2001A with the $68 million acquisition (the "Acquisition") of a 26.2% minority interest (currently 25%) in Asia Aluminum Group (formerly China Aluminum Group), AAH's principal aluminum extrusion subsidiary.[2]  None of the Company's North American competitors has an arrangement with a Chinese partner comparable to the Company's AAG relationship.

AAG is an investment holding company, incorporated under the laws of the British Virgin Islands, with five subsidiaries in Nanhai, China principally engaged in the production and sale of aluminum extrusion products and stainless steel products.  The five production facilities have a combined capacity of approximately 350 million pounds and plan to double combined capacity to approximately 660 million pounds by FY2006E.  AAG is currently in the process of building new extrusion facilities named the "Asia Aluminum Industrial City" in China's Zhaoqing Guangdong Province.  The extrusion portion of the Industrial City project is expected to cost approximately $140 million to construct.  Collectively, the Indalex alliance represents the world's second largest aluminum extruder in terms of combined capacity.

The following table illustrates AAG's standalone historical and projected summary financials.

---

(1) Market data as of May 20, 2005.
(2) Pursuant to the Acquisition, Indalex was granted a perpetual put/call option with respect to the remaining ownership interest in AAG. The Acquisition was a sale of 541,935 shares of AAG stock to Indalex.

SUN_IND000003726
A73

**ASIA ALUMINUM GROUP STANDALONE HISTORICAL AND PROJECTED SUMMARY FINANCIALS**

| ($ in millions) | FYE December 31, (1) | | | Projected FYE December 31, (1) | | |
|---|---|---|---|---|---|---|
| | 2002A | 2003A | 2004A | 2005E | 2006E | 2007E |
| Sales | $288.5 | $346.1 | $416.8 | $479.3 | $551.2 | $633.8 |
| % Growth | | 20.0% | 20.4% | 15.0% | 15.0% | 15.0% |
| Gross Profit | $64.5 | $65.8 | $112.3 | $129.7 | $150.4 | $175.4 |
| % Margin | 22.4% | 19.0% | 26.9% | 27.1% | 27.3% | 27.7% |
| EBITDA | $46.4 | $59.0 | $102.9 | $122.1 | $145.1 | $172.6 |
| % Growth | | 27.2% | 74.3% | 18.7% | 18.8% | 19.0% |
| % Margin | 16.1% | 17.1% | 24.7% | 25.5% | 26.3% | 27.2% |
| EBIT | $36.3 | $48.1 | $86.0 | $103.2 | $123.9 | $148.6 |
| % Margin | 12.6% | 13.9% | 20.6% | 21.5% | 22.5% | 23.5% |
| Net Income | $24.0 | $31.1 | $58.9 | $70.7 | $84.8 | $101.8 |
| % Margin | 8.3% | 9.0% | 14.1% | 14.8% | 15.4% | 16.1% |
| Indalex Equity Income from AAG | $6.0 | $7.9 | $14.8 | $17.7 | $21.2 | $25.5 |
| Cash Dividends to Indalex | 2.6 | 3.4 | 4.6 | 6.4 | 7.7 | 9.2 |

Note: Figures per company management as provided in the confidential information memorandum.

(1) Figures based on a December 31 year end. AAG's fiscal year runs from July 1 to June 30. Figures assume a conversion rate of 7.8 SHK to $1 USD.

Benefits of the alliance with AAG include the following:

► Flex capacity i.e. AAG reserves manufacturing capacity to produce aluminum extrusion products for the Company

  ▪ Enables the Company to shift longer lead-time products to AAG, freeing up domestic capacity to either meet shorter lead time demand or load balance during peak periods of demand

► Low-cost offshore sourcing alternative

  ▪ Enhances the Company's product offering to its North American customers by sourcing high value-added products, such as finished and fabricated items

    – Company is able to monitor standards of AAG-sourced products for quality assurance

► Differentiated "one-stop" approach for North American customers not provided by the Company's competitors

► Annual dividend stream equal to 25% of AAG's dividend distributions

  ▪ AAG is projected to generate operating profits at a CAGR of approximately 20% between FY2004A and FY2007E, which would provide the Company with a steady stream of incremental cash flow

## Historical Market Share Summary

Indalex has been effective in growing its share in the North American aluminum extrusion market since FY2002A. The Company has increased its market position by 1.1%, 0.4% and 1.0% in FY2002A, FY2003A and FY2004A, respectively. As of FY2004A, Indalex held 15.7% market share in the aluminum extrusion industry as compared to 12.6% as of FY2000A. Comparatively, Alcoa, the Company's largest competitor with regards to market share, decreased its market position by 1.1% over the same time period. Market share for the majority group of smaller niche players has also fallen to 34.9% in FY2004A from 42.3% in FY2000A. Product depth and breadth, comprehensive geographic reach and fall-outs in the Company's primary competitors have led to the Indalex's continued penetration within the aluminum space (see "Competitive Landscape and Comparable Companies Analysis" on page 7 for additional details).

SUN_IND000003727

A74

## Employees

The Company's facilities are covered by a number of union agreements, with no one agreement covering a substantial portion of the overall work force. The Company has historically maintained positive relations with each union and has experienced only one union imposed work stopped (Toronto, FY2003A) in five years. For YTD2005A, the Company has successfully renegotiated two union contracts and achieved positive results on wage and benefit cost containment. All union contract negotiations are complete for FY2005E, excluding the Toronto casting facility. 63% of the Company's workforce is covered under union contracts and approximately 76% of the Company's employees are production focused.

The following table illustrates the Company's current collective bargaining agreements. The average expiration date and term of the agreements are January 2007 and 3.5 years, respectively.

**COLLECTIVE BARGAINING AGREEMENTS SUMMARY**

| Location | Union | Expiration Date | Term (years) |
|----------|-------|-----------------|--------------|
| **United States** | | | |
| Modesto | Sheet Metal Workers | 3/31/2006 | 3.0 |
| City of Industry | Sheet Metal Workers | 10/31/2006 | 3.0 |
| Niles Extrusion | USWA | 12/31/2006 | 3.0 |
| Watsonville | United Brotherhood of Carpenters & Joiners | 3/31/2007 | 3.0 |
| Burlington | Operating Engineers | 4/30/2007 | 3.0 |
| Winton | Operating Engineers | 8/31/2006 | 2.0 |
| Fostoria (1) | Teamsters | 7/31/2005 | N/A |
| Girard | USWA | 1/31/2008 | 3.0 |
| Connersville | UAW | 6/1/2008 | 2.0 |
| Mountaintop | Operating Engineers | 3/1/2006 | 4.2 |
| **Canada** | | | |
| Mississauga | USWA | 1/12/2006 | 3.0 |
| Calgary | USWA | 4/30/2007 | 3.0 |
| Toronto Casting | USWA | 11/30/2005 | 4.0 |
| Montreal | USWA | 12/21/2008 | 8.0 |
| Vancouver | USWA | 9/30/2006 | 5.0 |

Source: Company management as provided in the Indalex management presentation.

(1) Plant is scheduled to close on July 31, 2005.

# Competitive Landscape and Comparable Companies Analysis

The aluminum extrusion industry remains somewhat fragmented, with a handful of major competitors and many small- to mid-sized regional operators. Many of the leading industry participants have geographically diverse operations. Providing access to a broad set of end users mitigates regional concentrations and negative macroeconomic trends.

The following table illustrates the annual extrusion capacity of Indalex and its major competitors.

SUN_IND000003728

A75

**ANNUAL EXTRUSION CAPACITY**
(Pounds in millions)

| Company | Annual Extrusion Capacity |
|---|---|
| Indalex | 800 |
| Indalex incl. AAG | 1,150 |
| | |
| Alcoa | 1,200 |
| Kaiser | 415 |
| Hydro | 410 |
| Tredegar | 320 |
| Sapa | 100 |
| | |
| High | 1,200 |
| Median | 410 |
| Mean | 489 |
| Low | 100 |

Source: Company management as provided in the Indalex management presentation.

On a global and domestic basis, the aluminum extrusion industry is made up of a limited number of large competitors and numerous smaller regional and local players. In some cases, as with Alcoa, competitors are fully integrated aluminum providers. These companies are both suppliers and competitors to non-integrated players. In other cases, as with Indalex, competitors are independent and only focus on aluminum extrusion. Indalex has historically competed against fully integrated and non-integrated extruders throughout North America.

The following table illustrates the strengths and weaknesses of the Company's major competitors as provided by Company management.

| Competitors | Strengths | Weaknesses |
|---|---|---|
| **Alcoa** | ▸ Widely recognized brand name<br>▸ Financially strong balance sheet<br>▸ #1 market share in aluminum extrusion industry | ▸ Arrogant interactions with customers – national accounts are not happy<br>▸ More focusing on aluminum mining operations and is not heavily invested in the aluminum extrusion business |
| **Hydro** | ▸ Active in high-growth automotive industry<br>▸ Good research and development<br>▸ State-of-the-art facilities<br>▸ Potential acquirer in the future | ▸ Difficult integration of VAW Aluminium AG (acquired in January 2002)<br>▸ Underperforming aluminum operations<br>▸ Costly smeltering operations have hurt margins |
| **Sapa** | ▸ Good research and development<br>▸ Small, focused U.S. operations<br>▸ Beautiful facilities | ▸ Weakness in commercial market penetration |
| **Kaiser** | ▸ Strong brand awareness | ▸ Currently in Chapter 11 bankruptcy since February 2002; filed Plan of Reorganization in June 2005 and expects to emerge from Chapter 11 protection during Q4 2005E |
| **Tredegar** | ▸ Market mix of customer base | ▸ Unwillingness to shrink volume results in large amounts of high margin inventory |

Source: Company management as provided in the Indalex management presentation.

The following table illustrates valuation multiples of comparable companies in the aluminum extrusion industry.

SUN_IND000003729

## GLOBAL METALS & MINING - ALUMINUM

($ in millions, except per share data)

| | Share Price (US$) | Equity Value (US$MM) | Enterprise Value (US$MM) | Enterprise Value / EBITDA[1] 2005E | 2006E | Price/Earnings[1] 2005E | 2006E | Price/Cash Flow[1] 2005E | 2006E |
|---|---|---|---|---|---|---|---|---|---|
| *Integrated & Upstream Aluminum Producers* | | | | | | | | | |
| Alcan | $32.77 | $12,070 | $18,855 | 7.0x | 6.5x | 13.4x | 11.9x | 5.9x | 5.5x |
| Alcoa | 28.10 | 24,590 | 32,593 | 8.2x | 7.2x | 15.6x | 12.9x | 7.9x | 7.0x |
| Alumina Ltd | 4.11 | 4,778 | 4,973 | 12.1x | 10.5x | 16.6x | 14.5x | 15.9x | 13.1x |
| Century Aluminum | 23.76 | 770 | 1,277 | 5.8x | 4.8x | 7.1x | 6.3x | 4.4x | 3.8x |
| Chalco | 0.56 | 6,145 | 6,705 | 4.4x | 4.8x | 7.7x | 8.5x | 5.1x | 5.5x |
| Hindalco | 28.53 | 2,638 | 3,176 | 4.8x | 5.2x | 7.1x | 8.4x | 4.9x | 5.4x |
| Nalco | 3.56 | 2,297 | 2,380 | 4.9x | 4.9x | 8.4x | 7.8x | 6.0x | 5.6x |
| **Group Average** | | | | 6.8x | 6.3x | 10.8x | 10.0x | 7.2x | 6.6x |
| **Major Aluminum Average[2]** | | | | 7.6x | 6.9x | 14.5x | 12.4x | 6.9x | 6.2x |
| **Minor Aluminum Average[3]** | | | | 5.0x | 4.9x | 7.5x | 7.7x | 5.1x | 5.1x |
| **Emerging Markets Average[4]** | | | | 4.7x | 5.0x | 7.7x | 8.2x | 5.3x | 5.5x |
| *Downstream Aluminum Producers* | | | | | | | | | |
| Aleris International | $21.82 | $691 | $1,063 | 4.8x | 4.9x | 5.8x | 7.2x | NA | NA |
| Novelis | 27.86 | 2,093 | 5,480 | 8.8x | 8.5x | 16.3x | 15.6x | 6.1x | 5.2x |
| Quanex | 58.38 | 1,482 | 1,762 | 5.2x | NM | 9.8x | NM | NM | NM |
| Tredegar | 16.15 | 628 | 708 | NM | NM | 16.1x | 13.0x | NM | NM |
| **Downstream Average** | | | | 6.3x | 6.7x | 12.0x | 11.9x | 6.1x | 5.2x |

Note:  Based on closing prices for July 19, 2005.
  Equity and Enterprise Values are Fully Diluted (includes in-the-money options and warrants).
(1)  Estimates based on consensus IBES forecasts, CSFB Equity Research and various Street Estimates.  Estimates have been calendarized.
(2)  Average includes  Alcan and Alcoa.
(3)  Average includes  Century, Chalco, Hindalco and Nalco.
(4)  Emerging Markets average includes Chalco, Hindalco and Nalco.

# Growth Opportunities

The following growth opportunities have been analyzed in our consideration of Indalex as an acquisition candidate:

▶ **Target incremental growth in select end-user segments**

- Trailer production is currently the second largest use of extrusion in North America

  – 11.7% CAGR in transportation volumes from FY2002A to FY2005E

  – Expected to be the largest user in FY2007E

- Unique value position of Indalex has met the demands of its initial trailer customer

  – Applied a National Accounts approach – single point of contact and purchasing leverage

  – Multiple manufacturing locations gave continuity of supply and geographic fit with trailer plants

  – Labor intensive components were sourced from the Company's Asian supply

- Springboard into additional accounts is expected to deliver approximately 10 million pounds of additional growth in FY2005E

▶ **Grow Customer Wallet Share**

- Company plans to focus on deeper penetration of its existing customer base to offer its full suite of products and to develop longer-term customer relationships

  – Wallet share of a major transportation customer has been expanded through the addition of fabrication and finishing to the customer's existing mill finish purchases

- Management has identified a minimum EBIT upside of approximately $3 million for FY2006E beyond what is included in the financial projections through customer wallet share growth

▶ **Target Penetration of Selected Geographies**

- Management intends to target an acquisition or establishment of a greenfield site in Texas or Mexico
  - Expansion of the Company's existing manufacturing facility base
  - More efficient servicing of the Southwest region, which is not as easily served with the Company's current facilities
  - Substantial labor cost advantages

▶ **Cultivate Smaller OEM Customers**

- Highly profitable as smaller OEMs are mostly concerned with on-time delivery and are not price sensitive
  - $0.20 / lb. advantage over Indalex average variable margin
  - Customers typically purchase additional value-added products, including fabrication and finishing
- The Company plans to expand its attention to this segment either through catalog buying or custom extrusion
- Currently serviced by the Indalex Direct program
  - Targeted sales efforts to industrial regions, including Chicago, Los Angles, Dallas, Houston and Atlanta, have resulted in 17 new accounts and a 10% increase in segment volumes in YTD2005A over the same period in FY2004A

## Financial Performance

The Company's YTD 5/31/2005A financial results started positively in 1Q2005A. Indalex was ahead of its initial budget and projected FY2005E to grow 35% over the prior year. The Company subsequently staffed up the peak season, retained price increases taken during H2 2004 and instituted a paint price increase in April 2005. Market slowdown in 2Q2005A resulted in a dramatic intake drop in April 2005 and labor costs that were higher than expected. As a result, the Company implemented stronger spending controls and headcount reductions.

In spite of start-up costs of $2.5 million for a new facility in Connersville, Indiana and market downturn during April 2005, the Company has seen stronger sales and GVA and steady variable margins in YTD 5/31/2005A compared to the same period in the prior year and the initial budget. The Company's net sales in YTD 5/31/2005A were $408.1 million, representing a 4.2% over net sales in YTD 5/31/2004A and 3.5% increase over the initial budget (despite lower sales volumes as compared to the initial budget). The following table illustrates the financial performance of the Company during YTD 5/31/2005A compared to YTD 5/31/2004A and the initial budget.

SUN_IND000003731

**YTD 5/31/2005A FINANCIAL SUMMARY COMPARISON ANALYSIS**

| | YTD | | |
| --- | --- | --- | --- |
| ($ in millions) | 5/31/05A | 5/31/04A | Budget |
| Volume (lbs. in millions) | 252.0 | 242.1 | 258.3 |
| | | | |
| Net Sales | $408.1 | $359.9 | $394.4 |
| Raw Material Costs | 251.0 | 211.2 | 239.2 |
| Gross Value Added (GVA) | $157.1 | $148.6 | $155.1 |
| | | | |
| Variable Costs | 84.0 | 81.6 | 81.1 |
| Variable Margin | $73.1 | $67.0 | $74.0 |
| | | | |
| **OPERATING DRIVERS** | | | |
| Net Sales / lb. | $1.62 | $1.49 | $1.53 |
| Gross Value Added (GVA) / lb. | 0.62 | 0.61 | 0.60 |
| Variable Margin / lb. | 0.29 | 0.28 | 0.29 |
| | | | |
| Raw Material Costs / lb. | $1.00 | $0.87 | $0.93 |
| Variable Costs / lb. | 0.33 | 0.34 | 0.31 |

**YTD 6/30/2005A - GROWTH RATES AND MARGIN ANALYSIS COMPARISON**

| Change from YTD 5/31/2004A | | |
| --- | --- | --- |
| Volume Growth | 4.1% | |
| Net Sales Growth | 13.4% | |
| GVA Growth | 5.7% | |
| | | |
| GVA Margin | 38.5% | 41.3% |
| Variable Margin | 17.9% | 18.6% |
| | | |
| Change from Budget 5/31/2004A | | |
| Volume Growth - Budget | (2.4%) | |
| Net Sales Growth | 3.5% | |
| GVA Growth | 1.2% | |
| | | |
| GVA Margin | 38.5% | 39.3% |
| Variable Margin | 17.9% | 18.8% |

Source: Company data.

Due to market softness and operational shortfalls at select Indalex facilities, the Company revised its projected financials in the management presentation from those in the confidential information memorandum. While the revised projections reflect a three-year average volume decline of over 4.2% from the initial projections, the Company continues to expect stable GVA/lb. and Adjusted North America EBITDA/lb. from stronger cost controls beginning in H2 2005E and product mix shifting towards lower margin but higher return Asian imports.

The following table illustrates the Company's projected financial comparison between the revised figures in the management presentation and the confidential information memorandum. The projections do not include the upside growth opportunities of the business i.e. the projected financials do not represent an upside operating case.

**PROJECTED FINANCIAL SUMMARY COMPARISON - CIM VERSUS MANAGEMENT PRESENTATION**

| ($ in millions) | Projected FYE December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2005A | 2006A | 2007A | 2005A | 2006A | 2007A |
| | Management Presentation | | | CIM | | |
| **VOLUME** | | | | | | |
| Volume (lbs. in millions) | 632.1 | 672.0 | 707.6 | 664.0 | 700.2 | 736.1 |
| Difference - lbs. | (31.9) | (28.2) | (28.5) | | | |
| % Growth / (Decline) | (4.8%) | (4.0%) | (3.9%) | | | |
| **NET SALES** | | | | | | |
| Net Sales | $1,021.0 | $1,084.5 | $1,141.5 | $1,053.6 | $1,111.3 | $1,168.8 |
| Difference - $ | (32.6) | (26.8) | (27.3) | | | |
| % Growth / (Decline) | (3.1%) | (2.4%) | (2.3%) | | | |
| % Growth | 9.2% | 6.2% | 5.3% | 12.7% | 5.5% | 5.2% |
| Difference | (3.5%) | 0.7% | 0.1% | | | |
| Net Sales / lb. | $1.62 | $1.61 | $1.61 | $1.59 | $1.59 | $1.59 |
| Difference | 0.03 | 0.03 | 0.03 | | | |
| **GROSS VALUE ADDED** | | | | | | |
| Gross Value Added | $390.6 | $410.5 | $424.9 | $402.7 | $420.5 | $435.8 |
| Difference - $ | (12.1) | (10.0) | (10.9) | | | |
| % Growth / (Decline) | (3.0%) | (2.4%) | (2.5%) | | | |
| % Margin | 38.3% | 37.9% | 37.2% | 38.2% | 37.8% | 37.3% |
| Difference | 0.0% | 0.0% | (0.1%) | | | |
| GVA / lb. | $0.62 | $0.61 | $0.60 | $0.61 | $0.60 | $0.59 |
| Difference | 0.01 | 0.01 | 0.01 | | | |
| **VARIABLE MARGIN** | | | | | | |
| Variable Margin | $184.4 | $197.0 | $205.8 | $194.4 | $204.5 | $213.3 |
| Difference - $ | (10.0) | (7.5) | (7.5) | | | |
| % Growth / (Decline) | (5.1%) | (3.7%) | (3.5%) | | | |
| % Margin | 18.1% | 18.2% | 18.0% | 18.5% | 18.4% | 18.2% |
| Difference | (0.4%) | (0.2%) | (0.2%) | | | |
| Variable Margin / lb. | $0.29 | $0.29 | $0.29 | $0.29 | $0.29 | $0.29 |
| Difference | (0.00) | 0.00 | 0.00 | | | |
| **ADJUSTED NORTH AMERICA EBITDA** | | | | | | |
| Adjusted North America EBITDA | $76.6 | $95.6 | $109.4 | $64.6 | $99.7 | $113.5 |
| Difference - $ | (8.0) | (4.1) | (4.1) | | | |
| % Growth / (Decline) | (9.5%) | (4.1%) | (3.6%) | | | |
| % Margin | 7.5% | 8.8% | 9.6% | 8.0% | 9.0% | 9.7% |
| Difference | (0.5%) | (0.2%) | (0.1%) | | | |
| Adjusted North America EBITDA / lb. | $0.12 | $0.14 | $0.15 | $0.13 | $0.14 | $0.15 |
| Difference | (0.01) | (0.00) | 0.00 | | | |
| **ADJUSTED WORLDWIDE EBITDA** | | | | | | |
| Adjusted Worldwide EBITDA | $87.9 | $109.1 | $125.7 | $95.9 | $113.2 | $129.8 |
| Difference - $ | (8.0) | (4.1) | (4.1) | | | |
| % Growth / (Decline) | (8.3%) | (3.6%) | (3.2%) | | | |
| % Margin | 8.6% | 10.1% | 11.0% | 9.1% | 10.2% | 11.1% |
| Difference | (0.5%) | (0.1%) | (0.1%) | | | |
| Worldwide EBITDA / lb. | $0.14 | $0.16 | $0.18 | $0.14 | $0.16 | $0.18 |
| Difference | (0.01) | 0.00 | 0.00 | | | |

SUN_IND000003733
A80

# EXHIBIT "13"

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
-----------------------------:
                             :   CIVIL ACTION
IN RE:  1H 1, INC., et al. :     NO. 09-10982 (PJW)
                             :
             Debtors. :
                             :
-----------------------------:
                             :
GEORGE L. MILLER,            :
Chapter 7 Trustee,          :
                             :
             Plaintiff, :
                             :   ADVERSARY PROCEEDING
         vs.                :    NO. 12-50713(PJW)
                             :
KIRKLAND & ELLIS, LLP,      :
                             :
             Defendant. :
                             :
-----------------------------:
```

The deposition of CAROL ANNE HUFF, taken

pursuant to the Federal Rules of Civil Procedure of

the United States District Courts pertaining to the

taking of depositions before Pauline M. Vargo, an

Illinois Certified Shorthand Reporter, C.S.R.

No. 84-1573, at Suite 700, 300 North LaSalle

Street, Chicago, Illinois, on May 28, 2014, at

9:03 a.m.

Page 19

1   Indalex?

2       A.      Yes.

3       Q.      Were any of the documents you were shown

4   yesterday documents you drafted?

5       A.      I was involved in drafting the offering

6   memorandum and the indenture.

7       Q.      Any other documents you were shown

8   yesterday that you were involved in drafting?

9       A.      No.

10      Q.      What was your involvement in drafting

11  the offering memo?

12      A.      I participated in drafting sessions with

13  the company and the underwriters and their counsel

14  to describe the business.

15      Q.      Can you estimate over what period of

16  time you participated in drafting sessions with

17  people from the company?

18      A.      Approximately winter, fall and winter of

19  2005.

20      Q.      Would that same time period cover the

21  sessions you had with the underwriters?

22      A.      Yes, I think so.

23      Q.      Who from the company did you participate

24  in drafting sessions with?

Page 66

1      A.     I don't recall.

2      Q.     Was there anyone from Indalex who was in

3  the negotiation group that you, Mr. Rowe, Mr. Garff

4  and Mr. Liff were in?

5      A.     Mike Alger.

6      Q.     Anyone else?

7      A.     I don't remember.

8      Q.     Who were the negotiations with?

9      A.     Cravath and the investment banks acting

10 as initial purchasers.

11     Q.     Do you remember any parts of the

12 indenture dealing with the interest in Asia

13 Aluminium Group?

14     A.     Yes.

15     Q.     What do you remember about that?

16     A.      It was contemplated in connection with

17 the acquisition of the company and negotiating the

18 financing on the bonds and the credit facility that

19 it was likely it would be sold, so specific

20 provision was made in the indenture and in the

21 credit facility to permit it to be sold and for the

22 proceeds to be applied in a specific way.  The way

23 we would think of it is that it was outside the

24 credit.

# EXHIBIT "14"

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
----------------------------:
                            :   CIVIL ACTION
IN RE:  1H 1, INC., et al.  :   NO. 09-10982 (PJW)
                            :
              Debtors.      :
                            :
----------------------------:
                            :
GEORGE L. MILLER,           :
Chapter 7 Trustee,          :
                            :
              Plaintiff,    :
                            :   ADVERSARY PROCEEDING
          vs.               :   NO. 12-50713(PJW)
                            :
KIRKLAND & ELLIS, LLP,      :
                            :
              Defendant.    :
                            :
----------------------------:
```

The 30(b)(6) deposition of KIRKLAND &

ELLIS, LLP, through CAROL ANNE HUFF, taken pursuant

to the Federal Rules of Civil Procedure of the

United States District Courts pertaining to the

taking of depositions before Pauline M. Vargo, an

Illinois Certified Shorthand Reporter, C.S.R.

No. 84-1573, at Suite 600, 300 North LaSalle

Street, Chicago, Illinois, on October 9, 2014, at

1:37 p.m.

1      A.      Do you mean what are these (indicating)?

2      Q.      As given to me, there is a set of

3   documents --

4      MR. BUCKLEY:   There is two documents on top,

5   all right.   These two go together.

6      THE WITNESS:   I didn't clip them, so --

7      MR. BUCKLEY:   And then the rest of them go

8   together.

9   BY MS. McILVAIN:

10     Q.      The first document you have been

11  testifying about has the numbers 182846 in the

12  bottom right corner, correct?

13     A.      Yes.

14     Q.      Okay.   And it has attached to it two

15  pages, correct?

16     A.      Yes.

17     Q.      The cover page of the offering memo and

18  then Page 126 of the offering memo, correct?

19     A.      Of the draft offering memorandum.

20     Q.      Correct.   Okay.   What's the next

21  document?

22     A.      An e-mail from the printer on

23  January 11th, 2006.

24     Q.      And what are the pages attached to that

Page 28

1  e-mail?

2      A.    The cover page to the draft offering

3  memorandum and Page 127 of the draft offering

4  memorandum.

5      Q.    And Page 127 reflects an addition to the

6  legal matters discussion, correct?

7      A.    Correct.

8      Q.    Why was that addition made?

9      A.    Because it's my practice to include a

10  disclosure in the legal matters section if Kirkland

11  & Ellis is giving a legal opinion and any of our

12  partners has a direct or indirect investment in the

13  issuer.

14      Q.    Did you make the decision to include

15  that addition to the legal matters section?

16      A.    Yes, I believe so.

17      Q.    Did you do it at anyone's instruction?

18      A.    No.

19      Q.    Did you do it while you were at the

20  printer?

21      A.    Yes.

22      Q.    Was anyone from Indalex at the printer?

23      A.    Yes.

24      Q.    Who?

Page 29

1        A.      Matthew -- or Mike Alger.

2        Q.      Was he there the entire time on

3    January 11th?

4        A.      I believe so.

5        Q.      Did you bring to his attention that you

6    were making this addition to the offering memo?

7        A.      I don't recall discussing it with him,

8    but he received a redlined version highlighting the

9    additional language.

10       Q.      Did you transmit that to him?

11       A.      He received it in person and by e-mail.

12       Q.      How many pages was in the redline

13   version?

14       A.      It would be a complete version of the

15   offering memorandum marked to show changes.

16       Q.      Was anyone else from Indalex at the

17   printer?

18       MR. BUCKLEY:  You are referring to that

19   January 11th day at the printer, correct?

20       MS. McILVAIN:  I am.

21   BY THE WITNESS:

22       A.      I don't recall who was present in person

23   other than Mike Alger.

24

# EXHIBIT "15"

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
--------------------------:
                          :   CIVIL ACTION
IN RE:  1H 1, INC., et al. :   NO. 09-10982 (PJW)
                          :
             Debtors.  :
                          :
--------------------------:
                          :
GEORGE L. MILLER,         :
Chapter 7 Trustee,        :
                          :
             Plaintiff, :
                          :   ADVERSARY PROCEEDING
        vs.               :   NO. 12-50713(PJW)
                          :
KIRKLAND & ELLIS, LLP,    :
                          :
             Defendant. :
                          :
--------------------------:
```

The deposition of ELISABETH MARTIN,

taken pursuant to the Federal Rules of Civil

Procedure of the United States Bankruptcy Courts

pertaining to the taking of depositions before

Pauline M. Vargo, an Illinois Certified Shorthand

Reporter, C.S.R. No. 84-1573, at Suite 700,

300 North LaSalle Street, Chicago, Illinois, on

May 16, 2014, at 8:29 a.m.

Page 20

1    Indalex and I know that we went to the printer with

2    representatives of Indalex.  I don't remember

3    having any specific conversations with

4    representatives of Indalex outside of the printer.

5    BY MS. McILVAIN:

6         Q.    And who was at the printer from Indalex?

7         A.    I don't remember everybody who was

8    there, but I do remember meeting Mike Alger and Tim

9    Stubbs.

10        Q.    I have reviewed your time records from

11   '05 and early '06.  It looks as though you went to

12   the printer twice.  Is that consistent with your

13   recollection?

14        A.    I don't recall how many times I went to

15   the printer.

16        Q.    Can you place in time when you met

17   Mr. Alger and Mr. Stubbs at the printer?

18        A.    That would have been in January of 2006.

19        Q.    And did they stay with you during an

20   entire period of time, or were they just there and

21   left?

22        A.    I don't remember when they were there

23   and when they left.

24        MS. McILVAIN:  Would you mark that as

# EXHIBIT "16"

**Subject:** Indalex Offering Memorandum Proof 5    06chi1039
**Submit Time:** 1/12/2006 13:07:36
**From:** "CHI Customer Service" <chicust@merrillcorp.com>
**To:** <jrisico@cravath.com> <JZavaglia@cravath.com> <WFogg@cravath.com> <frederic.distel@jpmorgan.com> <David.A.Dwyer@jpmorgan.com> <nam.x.kwok@jpmorgan.com> <mike_alger@indalex.com> <Tim_Stubbs@indalex.com> <Scott_C_Williams@indalex.com> <MJarff@suncappart.com> <plee@suncappart.com> <sliff@suncappart.com> <Bob_Kavanaugh@indalex.com> <bill_kenealy@indalex.com> <craig.munro@harrisnesbitt.com> <ian.sylvan@harrisnesbitt.com> <awodka@crowechizek.com> <mantonetti@crowechizek.com> <bkohn@deloitte.com> <Benjamin.Benaitar@jpmorgan.com> <lucy.1.jin@jpmchase.com> <james.goll@harrisnesbitt.com> <jay.dameron@harrisnesbitt.com> <amy.lauterjung@harrisnesbitt.com> <jrowe@kirkland.com> <chuff@kirkland.com> <enmartin@kirkland.com> <ckeetch@kirkland.com> <dgessner@kirkland.com> <tfrankel@kirkland.com> <wlohmann@kirkland.com> <csemonsen@kirkland.com> <jquinn@kirkland.com> <mwright@kirkland.com> <ssugino@kirkland.com> <djohanson@kirkland.com> <sobrien@kirkland.com> <janderson@kirkland.com> <sfischer@morganjoseph.com> <sspencer@crowechizek.com>
**Cc:** "Day, Peter" <Peter.Day@merrillcorp.com>

Please find your proof attached in .pdf  file as requested, cumulatively   marked(T~4).

You can view or print with Adobe Acrobat   software.

Your printer is most appropriately set to   legal-size paper or choose the "fit to page" setting.

Please call Team A Customer Service   directly at 312/786-6336 for any assistance.

Thank you,

Team A Customer Service

Merrill   Corporation

Did you know that Merrill offers a full   range of translation services (virtually all languages)? For more information,   click on the link below or contact your Merrill Salesperson.

http://www.merrillcorp.com/solutions/translations/index.htm

THIS MESSAGE IS INTENDED   ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS   MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY   DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY   PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY ME   IMMEDIATELY BY TELEPHONE, AND PERMANENTLY DELETE THE ORIGINAL MESSAGE.

THANK   YOU!

1039T05_T4.PDF

MERRILL CORPORATION FLANGST//12-JAN-06  06:42  DISK131:[06CHI9.06CHI1039]BA1039A.;15
mrll.fmt  Free:     348DM:0D  Foot:      0D/      0D  VJ J1:1Seq: 1 Clr: 0
DISK024:[PAGER.PSTYLES]UNIVERSAL.BST;51   4–5  B Cs:  47807

Subject to completion, dated January 13, 2006

**Preliminary offering memorandum**                    **Strictly confidential**



# Indalex Holding Corp.

## $280,000,000
## $              % Senior Notes due 2014
## $              Senior Floating Rate Notes due 2014

**Issue Price:        % for the fixed rate notes and        % for the floating rate notes**

The fixed rate and floating rate notes will mature on                    , 2014. Interest will accrue on each series of notes from                    , 2006, and will be payable, in the case of the fixed rate notes, on                    and of each year, and, in the case of the floating rate notes, on                    ,                    , and                    of each year. The first interest payment date in respect of the fixed rate notes will be                    , 2006 and the first interest payment date in respect of the floating rate notes will be                    , 2006.

We may redeem some or all of the fixed rate notes at any time after                    , 2010 and we may redeem some or all of the floating rate notes at any time after                    , 2008. We may also redeem up to 35% of each series of notes using the proceeds of certain equity offerings completed, in the case of the fixed rate notes, before                    , 2009, and, in the case of the floating rate notes, before                    , 2008. We may also redeem each series of notes, in whole or in part, prior to, in the case of the fixed rate notes,                    , 2010, and in the case of the floating rate notes,                    , 2008 at 100% of their principal amount, plus a "make-whole" premium, together with accrued and unpaid interest. The redemption prices are described on pages        and        . If we sell certain of our assets or experience specific kinds of changes in control, we must offer to purchase each series of notes.

The fixed rate and floating rate notes will be unsecured senior obligations and will rank equally with all our existing and future senior debt, rank senior to all our existing and future subordinated debt, and will be effectively subordinated to all of our existing and future secured debt, including our revolving credit facility, to the extent of the assets securing such debt. On the closing date, the fixed rate and floating rate notes will be guaranteed on a senior unsecured basis by Indalex Holdings Finance, Inc., our parent company, and by each of our domestic subsidiaries. On the closing date, our foreign subsidiaries will not guarantee the notes.

**See "Risk factors" beginning on page 21 for a discussion of certain risks that you should consider in connection with an investment in the notes.**

The notes have not been registered under the Securities Act of 1933 or the securities laws of any other place. We are offering the notes only to qualified institutional buyers under Rule 144A and to persons outside the United States under Regulation S.

The notes will not be listed on any securities exchange. Notes that are sold to qualified institutional buyers will be eligible for trading in the PORTAL℠ market.

We expect that delivery of the notes will be made to investors in book-entry form through The Depository Trust Company on or about January    , 2006.

*Sole book-running manager and co-lead manager*

## JPMorgan

*Co-lead manager*

## Harris Nesbitt

*Co-managers*

**Credit Suisse First Boston        Morgan Joseph        Piper Jaffray**

January    , 2006

**INDALEX OFFERING MEMORANDUM        Proj: P1026CHI06    Job: 06CHI1039        Color1: Mred        Color2: Mblue**
**File: BA1039A.;15**
**Merrill Corporation/Chicago (312) 786-6300        Page Dim: 8.250″ X 10.750″    Copy Dim: 40. X 60.**

*The information in this preliminary offering memorandum is not complete and may be changed.*

MERRILL CORPORATION FLANGST//12-JAN-06 06:41 DISK131:[06CHI9.06CHI1039]BG1039A.;17
mrll.fmt Free:    480DM/0D Foot:    0D/    0D VJ RSeq: 1 Clr: 0
DISK024:[PAGER.PSTYLES]UNIVERSAL.BST;51  4~5 B Cs:  1210

In making your investment decision, you should rely only on the information contained in this offering memorandum. We and the initial purchasers have not authorized anyone to provide you with any other information. If you receive any other information, you should not rely on it.

We and the initial purchasers are offering to sell the notes only in places where offers and sales are permitted.

You should not assume that the information contained in this offering memorandum is accurate as of any date other than the date on the front cover of this offering memorandum.

# Table of contents

| | Page | | Page |
|---|---|---|---|
| Notice to New Hampshire residents | iii | Management | 98 |
| Industry and market data | iii | Security ownership and certain | |
| Presentation of financial information | iv | beneficial owners | 102 |
| SEC review | v | Certain relationships and related | |
| Forward-looking statements | viii | transactions | 103 |
| Summary | 1 | Description of certain indebtedness | 106 |
| Risk factors | 21 | Description of the notes | 110 |
| Use of proceeds | 40 | Book-entry settlement and clearance | 177 |
| Capitalization | 41 | Transfer restrictions | 181 |
| Unaudited pro forma condensed | | Certain United States federal income | |
| combined financial data | 42 | tax considerations | 184 |
| Selected historical combined financial | | Plan of distribution | 190 |
| and operating data | 51 | Legal matters | 192 |
| Management's discussion and analysis | | Independent registered public | |
| of financial condition and results of | | accounting firm | 192 |
| operations | 55 | Where you can find more information | 192 |
| Business | 83 | Index to financial statements | F-1 |

Indalex Holding Corp. is a Delaware corporation and a wholly-owned subsidiary of Indalex Holdings Finance, Inc., a Delaware corporation, which will be a guarantor of the notes. Our principal executive offices are located at 75 Tri-State International, Suite 450, Lincolnshire, Illinois 60069, and our telephone number at that address is (847) 810-3000. Our website is located at www.indalex.com. The information on our website is not part of this offering memorandum.

In this offering memorandum, unless the context otherwise requires, "Issuer" refers to Indalex Holding Corp. and not to any of its subsidiaries; "Indalex parent" refers to Indalex Holdings Finance, Inc. and not to any of its subsidiaries; "Indalex," "we," "us" and "our" refer to Indalex Holdings Finance, Inc. and its subsidiaries, including the Issuer; and "initial purchasers" refers to the firms listed on the cover of this offering memorandum.

INDALEX OFFERING MEMORANDUM     Proj: P1026CHI06     Job: 06CHI1039     Color1: Mred     Color2: Mblue
File: BG1039A.;17
Merrill Corporation/Chicago (312) 786-6300     Page Dim: 8.250″ X 10.750″     Copy Dim: 38. X 54.3

Confidential

KEADV00010835